**SHEARSON HAYDEN STONE, INC., a Delaware Corporation, Plaintiff,**

v.

**LUMBER MERCHANTS, INC., f/k/a Associated Lumber Mills Inc., a Florida Corporation and Frank Malina, individually, Defendants.**

**No. 76–1205–CIV–JCP.**

United States District Court, S. D. Florida.

Sept. 30, 1980.

Lawrence R. Metsch, Miami, Fla., for plaintiff.

Phillip H. Bloom, Chicago, Ill., Mark Silverstein, Miami Beach, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND FACT

PAINE, District Judge.

This case was tried to the Court, without a jury, on Monday, March 24, 1980, at Miami, Florida. The Court has considered the testimony of the witnesses, the deposition transcript admitted into evidence by stipulation of the parties, the documentary materials admitted into evidence, the post–trial submissions of the parties, and the applicable decisional law. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the Court hereby renders its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

A. The Nature of the Action

1. Subject matter jurisdiction is based upon 28 U.S.C. 1332, diversity of citizenship.

2. This is an action in a commodity futures trading account where the plaintiff seeks to recover $60,897.63. Defendant, Lumber Merchants, Inc., by counterclaim, seeks damages caused by the plaintiff's liquidation of its commodities trading account.

B. Parties to the Action

3. Plaintiff Shearson Hayden Stone, Inc. (SHS) is a Delaware corporation with its principal place of business in the State of New York. At all times pertinent to this action, SHS was engaged in the business of brokerage of commodity futures contracts, including lumber. Further, at all times pertinent to this lawsuit, SHS was a member of the Chicago Mercantile Exchange (CME), the exchange upon which all lumber futures contracts issued in the United States were traded.

4. Defendant Lumber Merchants, Inc. (LMI), is a Florida business corporation with its principal place of business in the State of Florida. LMI was formerly known as Associated Lumber Mills Inc., having been incorporated in that latter name on July 31, 1975. Effective June 1, 1976 the corporate name was changed to Lumber Merchants, Inc.

5. Defendant Frank Malina (Malina) is a citizen and resident of the State of Florida.

Malina and Mr. Charles Freifeld with other individuals formed Associated Lumber Mills Inc., for the purpose of engaging in the lumber brokerage business and also for trading in lumber futures contracts. In May 1976 Malina purchased Freifeld's interest in Associated Lumber Mills Inc. at which time the name was changed to LMI.

C. The Claims of the Parties

6. SHS

a. SHS claims that it is entitled under the terms of a written Customer's Agreement to recover from LMI the sum of $60,897.63, plus interest, court costs and reasonable attorney's fee. In addition, SHS seeks an identical monetary award against Malina on the theory that at all pertinent times LMI was Malina's "alter ego."

b. LMI and Malina affirmatively assert that SHS is barred from recovery of the account debit balance for the reasons that: (1) SHS permitted the LMI account to become undermargined in the month of June, 1976 in violation of the applicable rules and regulations of the Chicago Mercantile Exchange; (2) SHS reneged on and breached a promise not to liquidate LMI's open lumber positions and to await the deposit of an additional $25,000.00 into the LMI account; and, (3) deceitfully dealt with LMI with regard to the corporation's trading account and the improper liquidation thereof. Further, Malina affirmatively contests SHS's "alter ego" claim based upon the facts that at all pertinent times the corporate integrity of LMI was fully maintained and respected and that there existed no legal or factual basis for holding him personally liable to SHS.

7. LMI's Counterclaim

For its counterclaim for damages against SHS, LMI claims that (1) SHS accepted new commodity futures contract orders and improperly permitted LMI's existing positions to remain intact when the account was undermargined during June and July, 1976; (2) SHS improperly liquidated LMI's open lumber future contract positions on July 8, 1976 and July 9, 1976, contrary to an express agreement not to do so; and, (3)

had not SHS improperly liquidated LMI's lumber future contract positions on July 8 and 9, 1976, LMI would have made substantial trading profits in the ensuing two weeks in the July futures contracts and LMI would have been free to do as it pleased with its September futures contracts, including liquidation or retention of some or all of the contracts through the expiration of the September contract.

D. The Inception of LMI's Trading Relationship with SHS

8. SHS, on August 27, 1975, opened Account Number 013-66897-1-8 in the name of Associated Lumber Mills, Inc. at SHS's Huntington, New York, branch office. Mr. Kenneth Hirshon was the registered representative responsible for initiating the account, which was to serve as a vehicle for trading in lumber futures contracts. Associated Lumber Mills, Inc., on August 27, 1975, had its principal place of business at 2500 East Hallandale Beach Boulevard, Hallandale, Florida. Subsequent to the opening of Account Number 013-66897-1-8, SHS, at its own expense, caused to be installed a private telephone connection between Malina's office in Hallandale, Florida, and SHS's office in Huntington, New York, for the purpose of facilitating trading in lumber futures contracts. Upon the change of name from Associated Lumber Mills, Inc. to LMI, SHS changed the name of the account but maintained the same account number.

9. Malina and his wife, on June 25, 1975, opened a joint commodity futures trading account at the Huntington, New York, branch office of SHS. That account was assigned Account Number 013-66708-8.

10. Mr. Kenneth Hirshon (Hirshon) was at this time employed by SHS as an account executive and registered representative, and was the broker who opened the foregoing accounts of LMI and Malina at SHS's Huntington, New York, branch office. Further, Hirshon supervised the trading activities of each account at all times pertinent and material hereto. Hirshon was

aware of the organization of LMI and the various principals involved therein at the time the account was opened with SHS and was further familiar with its operations at all times thereafter insofar as its activities in trading commodities futures with SHS acting as its broker.

11. Prior to trial, the parties stipulated that a specimen Customer's Agreement in use in 1975 contained the contractual provisions governing the relationship between SHS and LMI. That Customer's Agreement in pertinent part provided:

"3. All transactions for my accounts shall be subject to the provisions and regulations of all applicable federal, state and self–regulatory agencies including but not limited to the various commodity exchanges, the Board Governors of the Federal Reserve System and the constitution, rules and customs, as the same may be constituted from time to time, of the exchange or market (and clearing house, if any) where executed. Actual deliveries are intended on all transactions.

"4. Any and all property belonging to me in which I may have an interest held by you or carried in any of my accounts (either individually or jointly with others) shall be subject to a general lien for the discharge of my obligations to you, wherever or however arising and without regard to whether or not you have made advances with respect to such property, and you are hereby authorized to sell and/or purchase any and all property in any of my accounts with notice to satisfy such general lien.

"5. (a) Without notice to me, any and all property in my margin accounts may be carried in your general loans, and may be pledged, re–pledged, hypothecated or rehypothecated, separately or in common with other property, for the sum due to you thereon or for a greater sum and without retaining in your possession and control for delivery of a like amount of similar property. I will maintain such margins in my margin accounts as you may in your discretion require from time to time and will pay on demand any debit balance owing with respect to any of my margin accounts, and if not paid, you without notice to me may liquidate part or all of my holdings with you to satisfy said debit balance.

"5. (b) You may, in the event of my death or whenever in your discretion you consider it necessary for your protection, sell any or all property held in any of my accounts, cancel any open order for the purchase or sale of any property with or without notice to me, and you may borrow or buy in any property required to make delivery against any sale, including a short sale, effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you may in your discretion determine, and no demands, calls, tenders or notices which you may make or give in any one or more instances shall invalidate the aforesaid waiver on my part. At any such sale you may purchase the property free of any right of redemption and I shall be liable for any deficiency in my accounts.

\* \* \* \* \* \*

"6. In the event that you have to employ counsel to collect any debit which I owe to you, I hereby authorize you to charge me for the reasonable costs of collection including but not limited to attorneys' fees, court costs and expenses whatsoever in nature in effecting said collection.

\* \* \* \* \* \*

"9. This agreement shall inure to the benefit of your successors and assigns, shall be binding on the undersigned, his heirs, executors, administrators and assigns, and shall be governed by the laws of the State of New York . . .

"10. Your failure to insist at any time upon strict compliance with this agreement or with any of its terms or any continued course of such conduct on your part shall in no event constitute or be considered a waiver by you of any of your

rights or privileges. Notice or other communications made to me at the address given on the reverse side shall, until you have received notice in writing of a different address, be deemed to have been personally delivered to me.

  *  *  *  *  *  *

"14. This agreement constitutes our complete agreement and is not subject to any oral modification; the signing of this agreement revokes any and all other agreements made with Hayden Stone, Inc. or any of its predecessors, successors, or assigns."

12. SHS was during the period of time relevant to this lawsuit, and presently is, a member of the Chicago Mercantile Exchange, which is designated a contract market by the Commodity Futures Trading Commission.

13. At all times relevant to the transactions in dispute, Rule 827 of the Chicago Mercantile Exchange was in effect. This rule has been renumbered as Rule 928.

"928. *MARGINS OF CUSTOMERS.*

"a. The Board shall from time to time fix and have posted on the bulletin board the amounts of initial margins which must be obtained by all clearing members from their customers on speculative and bona fide hedge transactions, and the amount of minimum margins that must be maintained by customers on open trades including those resulting in straddle positions. For a transaction to be considered in a bona fide hedge, it must comply with the hedge requirements set forth in section 4(a)3 of the Commodity Exchange Act, and the regulations issued pursuant thereto, and Rule 723.

"b. Members shall not accept orders for new trades from a customer unless the minimum initial margin in the new trades is on deposit or is forthcoming within a reasonable time and unless the margin on that customer's preexisting open positions complies with the maintenance requirements established by the Board or is forthcoming within a reasonable time. Customer credits in excess of initial margin requirements on all open positions may be allocated to the initial margin on a new commitment but credits less than initial margin requirements but greater than maintenance margins may not be used in satisfaction of initial margin requirements.

"c. The clearing member may call for additional margins at his discretion, but whenever a customer's margins are depleted below the minimum amount required, the clearing member must call for such additional margins as will bring the account up to initial margin requirements, and if within a reasonable time the customer fails to comply with such demand (except for unusual circumstances the clearing member may deem one hour to be a reasonable time), the clearing member must close out the customer's trades or sufficient thereof to restore the customer's account to required margin status.

"d. If the clearing member is unable to effect personal contact with a customer, a written demand left at the customer's place of business or a telegram sent to the customer at the address furnished by him to the clearing member shall be deemed sufficient. The Board may delegate its power under this rule to the Clearing House Committee, reserving the right to change or modify any margin requirement fixed by the committee.

"e. Clearing members shall be responsible to the Exchange for all margin requirements.

"f. Violation of this rule shall constitute a major offense."

E. The Lumber Futures Margin Requirements.

14. The Handbook of the Association of Commodity Exchange Firms, Inc., during the period relevant to this controversy, defined the standard lumber futures contract in pertinent part as follows:

*"The Market*: Chicago Mercantile Exchange.

*"Trading Hours*: 9:00 a. m. to 1:05 p. m. (Chicago Time), except the last day of expiring contract when close is one hour earlier.

*"Contract Unit*: 100,000 bd. ft. or random length 2x4's, 5–10% 8 ft. lengths, 5–10% 10 ft. lengths, 10–15% 12 ft. lengths, 15–20% 14 ft. lengths, 50–60% 16, 18 or 20 ft. lengths provided that 16 ft. lengths shall not be less than 35% of the entire lot, and 0–15% over 16 ft. lengths. Species: Kiln Dried or Air Dried Hem–Fir.

*"Active Delivery Months*: March, May, July, September, November, January.

*"Quotations*: Symbol LB.

*"Order Data:* Destination Code CME. Order by number of contracts.

*"Minimum Price Fluctuation*: 10 cents per 1,000 bd. ft., or $10.00 per contract.

*"Maximum Daily Price Fluctuation*: $5.00 per 1,000 bd. ft. above or below previous day's settlement price.

*"Speculative Position Limit*: 300 in any one contract month. Maximum holding 1,000 contracts.

*"Speculative Daily Trading Limit*: 600 any one contract month; 2,000 maximum . . ."

15. An investor taking a "long" position with respect to a commodity futures contract becomes obligated, if the contract is held until its expiration, to take delivery of the covered commodity and to pay the full purchase price. An investor taking a "short" position in a commodity futures contract becomes obligated, if the "short" position is held until the contract's expiration, to deliver to the exchange the covered commodity. Typically, an investor taking a "long" position stands to gain should the price of the commodity rise, while an investor holding a "short" position stands to gain should the price of the commodity fall. A "straddle" or "spread" is a risk–limitation device whereby an investor is both "long" and "short" in the same commodity, but in different months. A "long" and a "short" position in the same commodity and delivery month would cancel out one another.

16. During the period relevant to this lawsuit, SHS required that its customers trading in lumber futures contracts maintain "initial margin" in the amount of $700.00 for each "long" or "short" position. Because the consequences of market fluctuations were less severe in the case of "straddle" or "spread" positions, SHS, during the period relevant to this case, required only $300.00 in the "initial margin" for each such position.

### F. LMI's Trading Strategy and the Resulting Liquidation

17. Between May 28, 1976, and June 21, 1976 LMI maintained "straddle" positions in the July, September and November, 1976, lumber futures contracts. "Initial margin" for each such "straddle" was only $300.00, as opposed to the $700.00 ordinarily required. The following table (from plaintiff's exhibit # 18) reflects, for the period May 28, 1976, through June 21, 1976, the equity, required margin, and margin call applicable to the LMI account with SHS.

| DATE | EQUITY | REQUIRED MARGIN | MARGIN CALL |
|---|---|---|---|
| May 28 | $33,838.37 | $38,800.00 | $ 00.00* |
| June 1 | $30,848.87 | $39,800.00 | $ 9,000.00 |
| June 2 | $11,178.87 | $45,000.00 | $34,000.00 |
| June 3 | $26,223.87 | $45,000.00 | $34,000.00 |
| June 4 | $28,033.87 | $45,000.00 | $34,000.00 |
| June 7 | $34,158.87 | $46,100.00 | $12,100.00 |
| June 8 | $32,631.37 | $37,000.00 | $12,100.00 |
| June 9 | $35,021.37 | $40,500.00 | $ 8,100.00 |
| June 10 | $38,976.37 | $47,500.00 | $ 8,100.00 |
| June 11 | $37,298.87 | $42,000.00 | $ 8,100.00 |
| June 14 | $39,976.37 | $40,500.00 | $ 8,100.00 |
| June 15 | $48,026.37 | $39,000.00 | $ 00.00 |
| June 16 | $59,393.87 | $51,500.00 | $ 00.00 |
| June 17 | $36,250.37 | $59,000.00 | $23,000.00 |
| June 18 | $44,920.37 | $36,300.00 | $23,000.00 |
| June 21 | $48,652.87 | $36,000.00 | $23,000.00 |

*The figures shown in the table reflect margin positions at the end of each day of trading.

18. At the trial, testimony was received that, on occasion, even though LMI's equity

was greater than its required margin, the margin call was not rescinded because "initial margin" had not yet been deposited as required by CME and SHS regulations. The following cash deposits were made into the LMI account during the period of May 28, 1976, through June 21, 1976. (From plaintiff's exhibit # 18):

| DATE | AMOUNT | |
|------|--------|---|
| June 2 | $ 640.00 | (from Account Number 66708-8, MALINA's private account) |
| June 3 | $10,000.00 | |
| June 7 | $20,000.00 | |
| June 9 | $ 5,000.00 | |

19. On or before June 21, 1976 LMI recognized a potential rise in cash market prices for lumber. Prior to June 21, 1976 Malina, as president of LMI, directed trading in the LMI account following a strategy of maintaining risk–limiting, spread positions in lumber futures contracts. With this observation and recognition of the upward movement in the cash market prices of lumber, Malina became convinced that LMI's trading strategy should be changed to take advantage of the rises in cash market lumber prices. This would be accomplished by LMI assuming substantial long positions in the July and September, 1976 contracts. Following discussion of this strategy with Hirshon, SHS's representative, Malina placed orders for LMI's account through Hirshon to achieve a net long position in the July and September 1976 contract.

At trial, Malina testified that towards the end of June, 1976, he became aware of a strong upward movement of "spot market" prices for lumber. Based upon this upward movement, he concluded that the lumber futures market would soon experience a similar upward movement and that the time was ripe to "lift the short leg" of LMI's "straddle" and to have LMI take strong "long" positions in the July and September, 1976, contracts. As Malina testified at trial, he was in June, 1976, well aware that the initial margin requirements for "long" positions were greater than for "straddle" positions and that the risks of loss were heightened.

20. The following table (from exhibit # 18) indicates for the period June 22, 1976 through July 7, 1976, the number of short positions in lumber held by LMI, the number of long positions, cash balance, equity and required margin. It is again noted that an increase in equity can never substitute for cash deposits to meet initial margin requirements.

| DATE | LONG (Sept. futures) | SHORT (July futures) | CASH | EQUITY | REQUIRED MARGIN | MARGIN CALL |
|---|---|---|---|---|---|---|
| June 22 | 98 | 75 | 39,582.87 | 48,582.87 | 38,600 | 23,000 |
| June 23 | 136 | 65 | 32,468.37 | 36,468.37 | 69,200 | 32,000 |
| June 24 | 136 | 70 | 32,468.37 | 28,068.37 | 67,200 | 39,200 |
| June 25 | 141 | 70 | 31,970.37 | 48,640.37 | 70,700 | 39,200 |
| June 28 | 136 | 46 | 62,062.37* | 79,492.37 | 76,800 | Ø |
| June 29 | 128 | 28 | 49,901.87 | 55,711.87 | 78,400 | 23,580 |
| June 30 | 103 | 27 | 41,908.87 | 59,638.87 | 61,300 | Ø |
| July 1 | 140 | 18 | 47,803.87 | 39,413.87 | 90,800 | 52,400 |
| July 2 | 160 | 17 | 37,222.37 | (28,617.63) | 105,200 | 133,900 |
| July 6 | 165 | Ø  35*** | 37,672.37 | (62,357.63) | 138,600 | 200,100 |
| July 7 | 165 | Ø  35*** | 62,672.37** | (63,097.63) | 140,000 | 203,100 |

*Cash deposit of 32,000 received
**Cash deposit of 25,000 received
***Long (July futures)

21. July 2, 1976, was the Friday immediately prior to the July 4th holiday weekend in that year. The next day in which lumber futures contracts were traded was July 6, 1976, a Tuesday. During the trading hours of July 6, 1976, orders were placed for trades in the LMI account and were accepted and executed by SHS through Hirshon and were in keeping with LMI's continuing strategy to achieve an outright long position in July and September lumber future contracts.

22. By this time, Mr. Malina was aware that this account was deficient in margin. He believed he had the financial ability to meet the required margin and had told Ken Hirshon that he was arranging for $200,000 to be transferred to his account in Florida. On July 6, LMI deposited $25,000 which was posted to its account the next day. But by July 7, it was apparent that Mr. Malina had failed to get the $200,000 that he had been endeavoring to obtain.

23. On the morning of Thursday, July 8, 1976, Malina flew from Fort Lauderdale, Florida, to New York City, arriving at approximately 10:30 a. m. (EST), and was met at the airport by Hirshon. Hirshon and Malina went immediately to SHS's Huntington Long Island office and were there met by Mr. Martin Reingold (Reingold), the manager of that office. During the journey from the airport to SHS's Huntington office Malina had informed Hirshon of the assets which LMI was willing to assign to SHS to secure its position in the Market. Those were LMI accounts receivable and title to some New Jersey real estate. Upon the arrival at the SHS office, Hirshon spoke privately with Reingold, the latter being advised of the immediate situation. Thereupon, and at approximately 11:30 a. m. Reingold put Malina on the telephone with Marvin Leiter, an SHS vice president office in New York City, whereupon Leiter advised Malina that he could not accept any assets from Malina other than treasury bills or municipal bonds.

Although it is unclear whether Malina spoke to Leiter one or two times that morning the evidence tended to show that the two agreed by telephone that Malina could attempt to raise additional capital to meet margin requirements. This extension was to be until 1:30 P.M. that day.

24. Prior to reaching this agreement, Mr. Leiter had placed a telephone call to the head of the SHS Commodity Department and requested that the LMI "long" positions in July and September, 1976, lumber futures contracts be sold "at the market" but in such a manner as not to unnecessarily depress that market. Pursuant to Mr. Leiter's request, instructions were relayed to SHS's personnel on the floor of the CME, who executed the following sales of LMI's "long" positions:

| ORDER NO. | DESCRIPTION | TIME ENTERED | TIME EXECUTED | DATE |
|---|---|---|---|---|
| 353 | 20 July LB | 10:53 | 11:06 | July 8 |
| 354 | 20 Sept LB | 10:53 | 11:01 | July 8 |
| 357 | 13 July LB | 11:03 | 11:06 | July 8 |
| 358 | 10 Sept LB | 11:03 | 11:06 | July 8 |
| 359 | 30 Sept LB | 11:08 | 11:15 | July 8 |

Mr. Leiter, at the conclusion of his telephone conversation with Malina, placed a second telephone call to the head of SHS's Commodity Department and requested that sales of the LMI positions be suspended because Malina had indicated that he would be able to raise the needed funds prior to the close of the CME. The head of the SHS Commodity Department was unable to tell Mr. Leiter how many LMI contracts had been sold as of that time. At about 1:00 p. m., New York time, Mr. Leiter was advised that 33 LMI contracts had been sold (which information, as it later developed, was incorrect).

25. Hirshon's understanding was that there would be no liquidation until 1:30 p.m. He and Malina left the office to attempt to raise some money. The two returned to the office around 1:30 without raising any additional capital. They advised Mr. Reingold of this who relayed this information to Mr. Leiter by telephone.

26. Mr. Leiter then told Mr. Reingold to advise Malina that 33 LMI contracts had been liquidated and that the rest would have to be sold. The conversation then ended and Mr. Leiter attempted to reach the head of the SHS Commodity Department with instructions to sell out the remaining LMI lumber futures positions. Mr. Leiter was unable to do so, however, before the close of the CME at 2:00 p.m., New York time.

27. Mr. Leiter then placed a telephone call to Mr. Reingold to advise that no contact had been made with the head of the SHS Commodity Department and that any remaining LMI positions would not be sold until the morning of the next day. Mr.

Leiter then spoke to Mr. Malina another time. Leiter rejected Malina's suggestion that no more futures be liquidated if Malina deposited $25,000 in the Hallandale, Florida office the next day. This was far short of the required margin which was in the $200,000 range.

28. At the conclusion of the telephone conversation between Mr. Leiter and Malina, Malina and Mr. Hirshon left the Huntington, Long Island, SHS office and returned to the airport. Malina then boarded a flight back to Florida.

29. Later in the day, Mr. Leiter learned that a total of 100 LMI "long" positions had been liquidated on July 8, 1976. Mr. Leiter asked Mr. Hirshon to relay that information to Malina and to advise Malina that the balance would be sold the next morning unless the monies were in SHS's hands. Mr. Hirshon reached Malina with that information at about 11:00 p.m., July 8, 1976.

30. At the close of business on July 8, 1976, LMI's account had a cash balance of $62,672.37. It held 2 "long" positions in the July lumber futures contract and 98 "long" positions in the September contract. The account's *deficit* was $54,777.63 and its required margin, due to the day's sales, was down to $70,000.00.

31. On Friday, July 9, Mr. Leiter spoke by telephone with the head of SHS's Commodity Department and directed that the LMI positions be liquidated. The following sales then took place on July 9, 1976:

| ORDER NO. | DESCRIPTION | TIME ENTERED* | TIME EXECUTED* |
|---|---|---|---|
| 1 | 2 July LB | 8:02 | 9:06 |
| 2 | 18 Sept LB | 8:02 | 9:09 |
| 316 | 20 Sept LB | 9:19 | 9:39 |
| 330 | 10 Sept LB | 9:52 | 9:55 |
| 334 | 50 Sept LB | 10:00 | 11:10 |

At the close of business on Friday, July 9, 1976, the LMI account held no positions whatever and had an unsecured "debit" balance in the sum of $60,897.63.

G. LMI as Malina's alter ego

32. LMI was wholly owned by Malina.

33. On occasion following the incorporation of Associated Lumber Mills, Inc., funds were transferred between the corporate trading account and the Malina private trading account maintained at the Huntington, Long Island, office of SHS. Malina testified that he had been unable to locate any corporate records reflecting LMI's activities, even though he had agreed to search for such records when deposed on February 22, 1977. He testified that LMI is now dormant, possesses virtually no assets and owes substantial sums of money to its creditors.

34. On July 8, 1976, Malina flew to New York City with a deed to real property owned by his wife and his wife's sister, which deed he was prepared to pledge with SHS as collateral to secure LMI's indebtedness.

35. There was no evidence presented concerning the existence of corporate books, cancelled checks, tax returns, or for notes concerning loans made by Malina to LMI to cover margin requirements.

36. Ken Hirshon, the registered representative, communicated only with Malina in regard to all account activity.

37. On at least three occasions Malina authorized transfers of money between the personal account and the LMI account. Malina personally assumed the responsibility for meeting margin requirements.

38. Malina was the sole beneficiary of LMI's trading activities and directed all of its transactions.

39. There was no evidence presented to support the contention that LMI was principally in the cash lumber business. The proof indicated that LMI was a conduit for Malina's commodity trading.

CONCLUSIONS OF LAW AND FACT

40. Based upon the evidence admitted at trial, the Court finds that LMI is liable to SHS for the amount of $60,897.63, the amount of the unsecured "debit balance" existing at the close of business on Friday, July 9, 1976. The Court further finds that SHS did not act improperly when it liquidated LMI's holdings on July 8, 1976, and July 9, 1976. On the contrary, the

Court finds that SHS at all times acted in compliance with the applicable rules and regulations of the CME and with the terms of the Customer's Agreement between LMI and SHS.

41. The Undermargined Condition of the LMI Account

Throughout this lawsuit, LMI has contended that SHS permitted LMI's account to become unlawfully undermargined throughout the month of June, 1976, and into July, 1976. In LMI's view, that claimed SHS practice was a "major offense" under the rules of the CME, thereby barring SHS from recovery in this action.

First, the Court concludes that the LMI account with SHS was *not* "undermargined" during the month of June, 1976. Up until the very end of that month, LMI maintained "straddle" positions in its account with SHS, thereby minimizing the risks of loss due to market fluctuations. Further, LMI, on June 2, June 3, June 7, and June 9, 1976, made substantial cash deposits pursuant to SHS's margin calls, which deposits totalled in excess of $35,000.00. It was only when LMI changed its trading strategy from "straddle" to "long" during the last week of June, 1976, that the LMI account required substantial amounts of additional margin. Because LMI, up until the last week of June, 1976, had responded within reasonable time to all demands for additional margin, the shift to the "long" strategy was permitted based upon Malina's assurances that $200,000.00 in additional capital would be forthcoming. Only when LMI was unable to produce the promised additional capital did the account become truly "undermargined."

Second, even if the LMI account with SHS *was* undermargined during June, 1976, LMI would not thereby be relieved of liability to SHS for the "debit balance" which resulted from the liquidation of LMI's positions.

42. Malina, who was an experienced and knowledgeable commodities investor, will not be given relief where he alleges that his account was maintained in an undermargined condition prior to its liquidation. *Merrill Lynch, Pierce, Fenner & Smith v. Brooks*, 548 F.2d 615 (5th Cir. 1977). Furthermore, LMI's claim for damages stemming from this allegedly undermargined condition does not have legal grounds.

43. No Agreement made by SHS to Defer Liquidation.

The Court has found, as a factual matter, that Mr. Leiter did not on July 8, 1976, promise to defer further liquidation of LMI's positions pending the deposit of $25,000.00 the following day. The Customer's Agreement entered into between SHS and LMI stipulated that the rules of the CME were applicable and that the agreement would be governed by the law of the State of New York. Under Rule 928 of the CME, SHS was obligated to liquidate LMI's positions when LMI, following "a reasonable time" could not come up with the required additional capital; that Rule was applicable, by contract, to the relationship between LMI and SHS. Furthermore, Paragraph 5(a) of the Customer's Agreement permits liquidation without notice where the customer has not maintained his margin requirements.

44. LMI as Malina's Alter Ego

(a) Florida law controls this issue. *Center Chemical Company v. Avril*, 392 F.2d 289 (5th Cir. 1968); *Koscot Dev. Corp. v. American Line Cosmetics*, 468 F.2d 64 (5th Cir. 1972).

(b) Utilization of alter ego to pierce the corporate veil is an equitable doctrine that must be applied sparingly. *Matter of Multiponics*, 622 F.2d 709 (5th Cir. 1980). To find that a corporation's separate legal identity should not be recognized it is necessary that the corporation merely be an instrumentality of that person, *Bendix Home Systems, Inc. v. Hurston Enterprises, Inc.*, 566 F.2d 1039 (5th Cir. 1978). Where the nature of the relationship and activity between the individual and his alter ego, his corporation, is completely personalized, the individual may be held liable for a contractual obligation made in the name of the corporation. *Levenstein v. Sapiro*, 279 So.2d 858 (Fla.1973).

■ Many factors can be considered in making this determination. The following factors are not meant to be conclusive but they are relevant to this action:

Whether corporate formalities were observed?

The degree to which the corporation was a vehicle for the shareholder's personal business interests.

The amount of equity capital.

The extent of domination of the corporation's affairs by a person or another entity by virtue of its ownership, control, and congruency of established goals.

■ (c) It was demonstrated that Malina completely dominated the operation of LMI, utilizing the corporation to conduct his personal lumber trading strategies. There was no showing by the defendants that LMI observed corporate formalities with regard to its record keeping or activities and there was no evidence as to its capital structure. While the initial burden fell to the plaintiffs to establish the alter ego, the burden shifted once such a close identity of interests was established and that Malina made all the purchase and sale decisions as well as being responsible for the margin. The weight of the evidence has overcome any presumption of separate identity between Malina and LMI.