**RAMARIA FAMILIENSTIFTUNG, et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

**No. 85–0466–CIV.**

United States District Court, S.D. Florida.

May 29, 1986.

Robert I. Targ, Pave and Targ, South Miami, Fla., Jay Solowsky, Solowsky & Allen, P.A., Miami, Fla., for plaintiffs.

Susan Aprill, Asst. U.S. Atty., Miami, Fla., for defendants.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

NESBITT, District Judge.

THIS CAUSE came before the Court for non-jury trial. Based upon the testimony adduced at trial and by deposition and relying upon only those portions of the record which are relevant, material and otherwise legally admissible, the Court, after due consideration of all issues, hereby renders the following findings of fact and conclusions of law.

### FINDINGS OF FACT

This is an action to quiet and confirm the fee simple title of Plaintiff, Unpedantic, Inc. ("Unpedantic"), in and to certain real property situated in Dade County, Florida and to quiet and confirm the mortgage lien of Plaintiff, Ramaria Familienstiftung ("Ramaria"), in and to that certain real property.[1] Defendant, United States Of America ("United States"), claims an interest in and to the real property identical to that of convicted felon Robert Sterling ("Sterling") by virtue of an Order and Judgment of Forfeiture entered in the *United States v. Robert Sterling, et al.,* United States District Court, Western District of Washington, Case No. CR82–86M.

The property at issue consists of two parcels of real estate located in Golden Beach, Florida. The legal descriptions of these properties are as follows:

(1) Lots 23, 24 and 25, Block "D" of Section A of Golden Beach, according to the Plat thereof, recorded in Plat Book at Page 52 of the Public Records of Dade County, Florida; together with all improvements situate thereon, and together with all riparian rights appurtenant thereto, if any. ("Parcel A")

(2) Lot 3, Block 2, Golden Beach, Section "A," as recorded in Plat Book 9, Page 52, of the Public Records, of Dade County, Florida. ("Parcel B")

Unpedantic, a Florida corporation,[2] is named grantee to Parcel A on a deed given by Aacon Properties Corporation dated November 1980. Unpedantic is also named grantee on a deed to Parcel B, given by Nat Ratner on March 30, 1981. Parcel B is located directly opposite Parcel A. Both Parcels A and B were sold in a 1985 interlocutory sale by order of this Court. The proceeds of that sale, after satisfaction of all taxes and liens, were placed in the Registry of the Court pending outcome of this matter.

Unpedantic's documentary ownership of these two parcels is undisputed. In order to resolve the conflicts as to title and claims to the property the Court must determine the validity of Unpedantic's interest as well as the effect of Ramaria's mortgage.

Even though Eliane Ingold ("Ingold"), fiancee of drug conspirator Sterling, was designated as personal representative and

---

1. Unless otherwise indicated, "Unpedantic" and "Ramaria" will be referred to as Plaintiffs.

2. Unpedantic was organized under the laws of Florida on September 15, 1980, involuntarily dissolved on December 16, 1981 and reinstated on or about May 11, 1982.

alleged owner of both Unpedantic and Ramaria, the Court finds the weight of evidence demonstrated that the true owner of Unpedantic was in fact Sterling. Sterling was initially Director of Unpedantic and for a period of time served as Vice-President. He selected Carolyn Harris ("Harris"), a convicted co-felon in his drug enterprise, to serve as President. Sterling's attorney, Murray Weil ("Weil") was named as registered agent for the company and later designated Assistant Secretary. Edna Brennen, Weil's secretary, served as Vice-President, Secretary and Incorporator.

The Court finds that Sterling formed Unpedantic for the express purpose of acquiring Parcel A and to avoid claims of creditors. Alleged owner Ingold was not identified as an officer or director of Unpedantic until January 23, 1985, and was denominated as such for the first time in the corporation's 1985 Annual Report.[3] Prior to that date as documented in the corporation's March 11, 1982 Annual Report—long after the transactions from which this case arises had occurred—Sterling served as the sole Director and President.

The Court further finds that Ingold never exercised control over Unpedantic. Rather, Sterling appears to have been in full control of the corporation, at least until February of 1982. He signed corporate checks and reports, he engaged decorators and vendors, he instructed his co-conspirator to serve as President and he lived in Unpedantic's only asset—the home located on the property at issue herein. Ingold conceded that Sterling arranged for the closing funds to be deposited in the United States and instructed her as to what bank should accept the transfer.

On September 12, 1980, Sterling entered into a contract with Aacon Corp. for the purchase of Parcel A and furnished $90,000 in drug proceeds as down payment for the property. The balance of the purchase price for Parcel A was paid with two Unpedantic drafts in the respective amount of $790,000 and $5,299.06, issued by Weil at closing on November 3, 1980.[4]

Despite discovery efforts, neither the Plaintiffs nor the Defendant presented the Court with a fully documented chain of possession leading to discovery of the origin of the funds. Plaintiff Unpedantic contends that it received the funds to close the purchase of Parcel A from Ingold's brother-in-law, Concalo (Salou) Passos ("Passos"). Ingold contends that Passos loaned her $875,000, more than the amount necessary to close the purchase, to use as down payment on the purchase of the property. Passos allegedly made this "investment" solely on the basis of an oral agreement among Sterling, Ingold and Passos without a writing of any sort and without even being made a shareholder in Unpedantic.

Ingold testified that she arranged for the formation of Ramaria, a Liechtenstein foundation, to utilize as a conduit for transferral of the aforementioned funds from PASSOS to Unpedantic and that she is and always has been Ramaria's sole trustee and beneficial owner.[5] Ingold testified that she authorized the transfer of funds from Ramaria to a bank in the Bahamas upon the instructions of Sterling. The testimony of Ingold was corroborated only by the deposition testimony of Passos who refused to appear for trial.

The government, on the other hand, contends that the funds used to purchase Par-

3. The only stock certificate produced at trial was in the name of and signed by Ingold as issuer and President. That certificate was the only document presented to the Court which contained Ingold's name prior to 1985. As Weil testified that no stock was issued while he maintained the corporate book, until April of 1982, the Court finds that the stock certificate was not genuine.

4. Sterling, Harris and Weil appear to be the only persons ever authorized to sign Unpedantic

checks drawn on Unpedantic's corporate account # 0101036310 at Capital Bank, North Bay Village.

5. Ingold further testified that all stock in Unpedantic was given to her as a "gift" from Sterling, who bought her the home in anticipation of their marriage and that she paid nothing for the shares. The Court finds this evidence incredible and contrary to common sense and reason.

cel A originated with Sterling and were proceeds from his illegal drug transactions. The Court has considered the evidence presented by the parties and finds the following facts concerning the origination of the funds relevant in making its determinations.

Tracing the funds' derivation in reverse chronological order, the Court finds that proceeds to close Parcel A's purchase were deposited in Unpedantic's Capital Bank account through an $875,000 bank draft issued by Southeast National Bank in Miami ("Southeast") to Unpedantic and drawn on the account of correspondent bank, the Royal Bank of Canada ("RBC"). Southeast issued this draft on November 3, 1980, following the presentation of an $875,000 draft by an individual identified as Emanuel John Lauricella [6] ("Lauricella"). The $875,000 draft was made payable to Unpedantic from "Timmons Int'l.," and was drawn on the RBC branch at Nassau, Bahamas on October 30, 1980. The Court could not determine how Lauricella obtained the RBC draft.

Southeast employee Ana de la Fuente testified that Lauricella must have presented the RBC draft and exchanged it for the Southeast draft, because handwritten entries on Southeast's non-negotiable reference copy of the draft reflect that Lauricella obtained the check. Ms. de la Fuente was the officer who issued the Southeast bank draft. She testified that the Bank's practice precluded an exchange of drafts until a cable was received from the sending bank (RBC) to confirm that funds existed to cover the transaction. Lauricella later delivered the Southeast draft to Sterling or his agent.

Although the United States did not pinpoint the exact origin of the RBC draft at trial, it did produce evidence which proved that Sterling had, in fact, filtered drug proceeds through RBC channels via co-conspirators such as Harris and Lauricella. Evidence showed that Sterling sent couriers to the RBC branch in Nassau to deposit drug proceeds on multiple occasions during 1980–81 and that Sterling employed Lauricella and used Lauricella's bank accounts at RBC to launder these proceeds. Marvin Levy ("Levy"), another Sterling co-conspirator, testified that he managed Sterling's New York office and gave directions to couriers to transport currency to the Bahamas during 1980. Levy also testified that he observed couriers packing large sums of currency on their persons to take to Switzerland and the Bahamas. He recounted how Sterling had instructed couriers to transfer currency abroad.

One of Sterling's couriers, Harris, testified that she transported drug proceeds to Switzerland for Sterling on at least four occasions, two in the autumn of 1980, one shortly before Christmas 1980 and at least one other time in the summer of 1981. Harris testified that she and three other couriers each carried between $150,000 and $200,000 on their persons to Zurich in October 1980. She and two of the others also traveled to Zurich about one month later carrying similar sums. In December 1980, Harris testified that she flew to Zurich alone.

On the first two trips, Harris testified that she turned the currency over to a Canadian, P.J. Taylor, in a Zurich hotel. On the second trip, Harris traveled with Taylor to Liechtenstein. In Liechtenstein, she was introduced to an individual whom she believed to be a banker in a bank where Taylor transacted business. On a third trip to Zurich, Harris, accompanied by a Portuguese male, identified as "Salou," a brother-in-law of Ingold, entered a bank in Zurich which she believes to have been Credit-Suisse. There, Harris converted smuggled currency into a check in the presence of, or with the assistance of "Salou." Immediately thereafter, Harris traveled to Liechtenstein. Pursuant to instructions from Sterling or one of his assistants, she made contact with the individual she had

---

**6.** Lauricella was a Sterling co-conspirator and has been convicted of federal crimes carried out for the Sterling organization.

previously been introduced to by Taylor. She deposited the Credit-Suisse check with him and in return received a receipt. Although Harris could not recall the exact words on the receipt, she recalled that it bore a "long German name with something like 'family' in the middle." She stated that she was chastized by Sterling for having carried the receipt back to the United States and as a result she discarded it.

At trial, Harris specifically identified her endorsement on the RBC draft exchanged for the Southeast bank draft on November 3, 1980. She recalled being in a Miami bank on one occasion with Lauricella while he waited for a transfer of funds from the Bahamas. The Court finds as a reasonable inference from the evidence that Harris accompanied Lauricella to Southeast where the drafts were exchanged. The Court finds that Lauricella and Harris waited for a telex confirmation prior to receiving the draft eventually deposited at Capital Bank for the closing.

The United States introduced evidence of a $45,000 deposit to Unpedantic's Capital Bank account, dated December 12, 1980 identified by RBC with a "Timmons, Int'l." account at the RBC branch in Nassau. The Court notes that funds from the $875,000 "Timmons, Int'l." draft were ultimately used by Unpedantic to purchase Parcel A. The Court further finds that evidence produced at trial links "Timmons Int'l." to various real estate purchases made with drug proceeds. The Court specifically finds this $45,000 transfer to be inconsistent with Plaintiffs' contention that the $875,000 sent from the RBC on November 3, 1980 out of the same "Timmons, Int'l." account was from a legitimate source and had somehow been transmitted from Liechtenstein for the express purpose of purchasing Parcel A.

With respect to Parcel B, the parties stipulate and the Court finds that Sterling closed the purchase of Parcel B with $45,000 obtained from drug dealings. The parties also stipulate and the Court finds that Sterling spent an additional $10,500 to $15,000 in drug proceeds on improvements to Parcel B.

On or about March 15, 1981 Sterling asked Clayton Pitts ("Pitts") to become Vice President of Unpedantic apparently for the sole purpose of executing a mortgage. On March 16, 1981, Pitts signed a mortgage allegedly securing a loan of $915,000 from an entity identified as mortgagee Ramaria. Pitts testified by deposition that he had had no prior knowledge of Ramaria. Weil, who prepared the mortgage and witnessed Pitts's signature, also testified that he had no prior awareness of Ramaria's existence. Weil further testified that he had never heard that Unpedantic intended to execute a mortgage to Ramaria or anyone at any time prior. Weil testified as an experienced real estate attorney that he has represented clients in numerous real estate transactions and, in his opinion, mortgages securing loans made to purchase real property are generally executed at closing when the purchase is funded. According to Weil, Sterling requested that Weil prepare an "after-the-fact" mortgage because Sterling was "concerned" about claims pending against *him* in the spring of 1981. The Court finds the testimony of Weil credible and unrebutted.

In April of 1982, in *United States v. Sterling*, CR82–86M(T) (W.D.Wash.1982), Sterling was named in a fifteen-count indictment in the Western District of Washington for violation of Titles 18 and 21 of the United States Code. The Washington District Court entered a restraining order pursuant to 21 U.S.C. 848(a)(2), enjoining the sale or transfer of

any goods, chattels, fixtures, choses in action, or other property, whether real or personal, owned, operated, held, or used by the defendant, Robert Sterling, Unpedantic, Inc., Talent Mine, Inc., Cinemation, Inc., A. Sterling Gold, Inc., and Ramaria Familien Stifung, or their agents, including, but not limited to, all stock, interests, and securities of Unpedantic, Inc., a Florida corporation, real property located in the State of Florida, personal property, wherever situated, and any

stocks, bonds, bank deposits, contractual rights, moneys due or owing to the defendant Unpedantic, Inc., Talent Mine, Inc., Cinemation, Inc., A. Sterling Gold, Inc., and Ramaria Familien Stifung, from any other person or entity; except in connection with expenditures for the necessities of life of Robert Sterling.

Weil, as registered agent, was served with this Restraining Order on or about April 10, 1982. The Washington District Court entered a Notice of Lis Pendens with respect to the subject real estate which was recorded in the public records of Dade County on April 20, 1982.

Sterling was thereafter convicted of drug violations by a jury and the district court accordingly entered an order and judgment of forfeiture on October 18, 1982. By special verdict, the jury forfeited certain Sterling property finding that it "afforded a source of influence over" Sterling's drug enterprise or that it amounted to "proceeds" of the continuing criminal enterprise forfeitable under 21 U.S.C. § 848(a)(2)(A) and (B). The court in its order forfeited, among other things, both Parcels A and B, all personal property contained within them and Unpedantic. There is no evidence that a representative of Unpedantic ever filed a petition for remission or sought in any way to intervene in that criminal forfeiture.

The Court finds that there is sufficient evidence to infer that drug proceeds were deposited in Plaintiff Ramaria's Liechtenstein account in the autumn of 1980. The Court finds that Plaintiffs have offered no credible evidence, documentary or otherwise, to show that the $875,000 check used to purchase Parcel A originated from Ramaria or was sent from Liechtenstein. The Defendant, on the other hand, has offered substantial evidence, albeit circumstantial, to show that the funds used to purchase the Golden Beach property were derived from Sterling's drug enterprise. The Court finds that Ramaria, at best, is a paper foundation controlled by Ingold and established pursuant to Sterling's desire to avoid creditors or adverse parties in litigation and that the relationship between Unpedantic and Ramaria is clearly incestuous and not at arms-length. Accordingly, the Court finds the interests of the two entities to be inexorably tied together with the Sterling drug enterprise. Considering all evidence produced by the parties and weighing the credibility of the various witnesses, the Court concludes that the amount of $875,000 deposited into Unpedantic's account on November 3 was proceeds of the Sterling criminal enterprise.

## CONCLUSIONS OF LAW

This Court has jurisdiction to adjudicate the disputed title to real property in which the United States claims an interest pursuant to 28 U.S.C. § 2409(a).

Plaintiffs are a Florida corporation, Unpedantic, Inc., organized under Chapter 607, Florida Statutes, and Ramaria Familien Stifung, a Liechtenstein foundation not registered to do business in Florida. The deeds to the subject real estate (which is comprised of two parcels, A and B) identify Plaintiff Unpedantic as grantee.

■ The Court is aware of no legal basis for Unpedantic to be a plaintiff in this action insofar as Ingold, the individual who purports to be both President and Director of Unpedantic, has not demonstrated that she has any lawful standing to bring this action on behalf of that corporation. The evidence adduced at trial shows that Sterling or Sterling nominees other than Ingold served as officers and directors of Unpedantic from its inception forward. The only evidence showing Ingold to be an officer or director is documentation created in 1985, *after* the United States' claim to Unpedantic attached. The Court therefore finds that this documentation fails to support Ingold's assertions of directorship or ownership.

Moreover, it appears to this Court that Ingold was never the beneficial owner of Unpedantic. Ownership may be evidenced in a variety of ways. *United States v. One 1981 Datsun 280ZX*, 563 F.Supp. 470, 474 (E.D.Pa.1983). In determining ownership in civil forfeiture proceedings under 21

U.S.C. § 881(a), courts have analyzed the indicia of dominion and control: possession, title and financial stake. *Id; See also United States v. One 1945 Douglas C-54,* 604 F.2d 27, 28 (8th Cir.1979), *cert. denied sub nom., Stumpff v. United States,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 294 (1982); *General Finance Corp. v. United States,* 333 F.2d 681, 682 (5th Cir.1964). The Court concludes that Ingold does not have a sufficient ownership interest in Unpedantic to challenge the criminal forfeiture in this or any other forum. The Court concludes that Ingold never exercised the necessary level of dominion and control to establish her ownership of Unpedantic and finds that she has no standing to represent the corporation. *See United States v. U.S. Currency Amounting to Sum of Thirty Thousand Eight Hundred Dollars,* 555 F.Supp. 280 (S.D.N.Y 1983).

Ramaria claims an interest in the real estate by virtue of a mortgage placed on Parcel A in the amount of $915,000. The United States' interest in the real estate results from the criminal forfeiture by the government of both Unpedantic and Parcels A and B in October 1982. That forfeiture was imposed as an *in personam* penalty against Sterling under 21 U.S.C. § 848(a)(2), the Continuing Criminal Enterprise Statute ("CCE statute"). *See United States v. Grammatikos,* 633 F.2d 1013 (2d Cir.1980).

The legislative purpose of 21 U.S.C. § 848(a) is, in part, to remove from the violator the profits and proceeds derived from his engagement in criminal enterprises by separating him from his dishonest gain. The forfeiture provisions of 21 U.S.C. § 853 were intended "to strip illicit drug rings of all profits and property, and thereby provide an additional deterrent to

such activity." *United States v. Long,* 654 F.2d 911, 915–16 (3d Cir.1981). The CCE statute does not require that the ill-acquired interest be in existence at the time of conviction to subject it to forfeiture.

■ The United States' interest in the Golden Beach property attached at the time of Sterling's criminal conviction on October 18, 1982. The government's interest, however, *vested* at the time Sterling committed the unlawful acts for which he was convicted. *See United States v. Ginsburg,* 773 F.2d 798 (7th Cir.1985). Sterling was engaged in the criminal enterprise well before September 1980. Thus, the government's rights in Unpedantic were not defeated by Sterling's dissipation or transfer of proceeds subject to forfeiture prior to his conviction. *Id., See also Long,* 654 F.2d at 916. The government's right to the proceeds of the continuing criminal enterprise were not limited to what remained in Sterling at the time of conviction, but included the entirety of the profits and proceeds of his criminal enterprise.

■ It is conceded that in Sterling's prior criminal case in Washington, the jury forfeited Unpedantic, the corporation, as well as Parcels A and B and other Sterling property. Thus, even if this Court concluded that the funds deposited into Unpedantic's Capital Bank account to close the purchase of Parcel A on November 3, 1980, were not proceeds, the Court would still find that Unpedantic was a Sterling alterego, formed and controlled exclusively by Sterling until at least 1982, *See Bendix Home Systems, Inc. v. Hurston Enterprises,* 566 F.2d 1039, 1041 (5th Cir.1978), and was properly forfeited along with *its* real estate holdings.[7]

---

7. As to the issue of notice of the government's claim, the Court concludes that Unpedantic received legal notice of the criminal forfeiture when Sterling, an officer, was served with an indictment seeking to forfeit Unpedantic and its assets on or about April 6, 1982, and by the service of the Restraining Order issued in the Western District of Washington, on Weil, on or about April 10, 1982. *See United States v. Raimondo,* 721 F.2d 476, 477 (4th Cir.1983), *cert.*

*denied, Bello v. United States,* 469 U.S. 837, 105 S.Ct. 133, 83 L.Ed.2d 74 (1984).

The Court additionally concludes that Ramaria received legal notice of the criminal forfeiture at such time as Sterling, Weil, or other Sterling attorneys advised Ingold of the Indictment and the Restraining Order, the latter of which specifically restrained Ramaria. Thus, Ingold, sole trustee of Ramaria, was put on inquiry notice and had a duty to investigate.

The Court concludes that any attempt by Sterling to transfer his ownership interest in Unpedantic, by stock certificate or otherwise, did not defeat the government's interest in Unpedantic because the government's rights clearly vested prior to September 15, 1980, the formation date of Unpedantic. Moreover, the Court concludes that any such transfer attempt by Sterling was in the nature of a gift and without consideration. Accordingly, neither INGOLD nor her heirs, successors, assignees or other transferees have any right in Unpedantic as bona fide purchasers for value, superior to that of the government.

The government's position is that Sterling is the alter-ego of Unpedantic. *Center Chemical Co. v. Avril*, 392 F.2d 289 (5th Cir.1968); *Koscot Development Corp. v. American Line Cosmetics*, 468 F.2d 64 (5th Cir.1972). In determining whether a corporation is a device or sham or a mere instrumentality of another corporation or individual owning all or most of its stock, Florida courts do not hesitate to pierce the corporate veil and look to the individuals who compose the corporation. This is also true where the purpose of the corporation is to evade some statute or to accomplish some fraud or illegal purpose. *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So.2d 1114 (Fla.1984). *See also In re: Kassuba*, 10 B.R. 309 (S.D.Fla.1981). Moreover, where an individual, such as Sterling, dominates the operation of a corporation and uses it to conduct his personal enterprise, and there is no showing of a capital structure or that the corporation ever observed corporate formalities, a presumption that the individual and the corporation have separate identities is overcome by the alter-ego doctrine. *Shearson Hayden Stone, Inc. v. Lumber Merchants, Inc.*, 500 F.Supp. 491, 501–02 (S.D.Fla.1980). Once such a close identity of interest between Sterling and Unpedantic is shown, the burden shifts to Plaintiffs to show their entitlement to Unpedantic's real property assets.

A mortgage under Florida law creates a specific lien on property and not a conveyance of the legal title. *Fla.Stat.* § 697.02 (1985). The Court concludes, as a matter of law, that the mortgage dated March 16, 1981, given by Unpedantic to Ramaria Familien Stifung is a sham and must be disregarded for the following reasons:

(a) It was given without consideration several months after the alleged loan it presumably sought to secure. That "loan" was made pursuant to an oral agreement and is therefore unenforceable under Florida law. *Fla.Stat.* 725.01 (1985).

(b) It was not arms-length and was given at the behest of Sterling in an effort to protect *his* interests.

(c) It was executed only *after* Ingold learned that Sterling had potential criminal liability as a narcotics trafficker and tax violator and was executed by Weil after Sterling expressed "concern" for the protection of his interest in the property. *See Garner v. Pearson*, 545 F.Supp. 549, 561–63 (M.D.Fla.1982), *aff'd*, 732 F.2d 850 (11th Cir.1984).

In 1984, Congress amended the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.*, to include a particular procedure which third parties seeking to challenge a criminal forfeiture must follow, as well as a delineation of each parties' burden of proof. The forfeiture at issue herein occurred prior to this amendment, however, and the burdens set forth in the new amendment are therefore inapplicable. As this Circuit is silent on the issue of pre–1984 burdens in such cases, the Court elects to adopt the approach utilized by the Fourth Circuit Court of Appeals in *United States v. Premises Known as 3301 Burgundy Road*, 728 F.2d 655 (4th Cir.1984). Accordingly, both parties must come before the court on an

*Amjems, Inc. v. F.R. Orr Construction Co.*, 617 F.Supp. 273 (S.D.Fla.1985). The mortgage identifies no individual agent for Ramaria or address at which Ramaria could receive legal notice. The only indication as to the control of Ramaria was Weil, whose name appears as preparer. Therefore, Weil was properly served with notice.

equal footing. *See Burgundy Road* at 657.

■ The United States has satisfied its burden in the following ways: (1) through proof of the criminal forfeiture of Unpedantic and its real property assets by a jury, which convicted Sterling in 1982. *United States v. Sterling*, 82–84M(T) (W.D. Wash. 1982), *aff'd*, 742 F.2d 521 (9th Cir. 1984); (2) through presentation of substantial evidence showing (a) that Sterling formed and controlled Unpedantic at all relevant times, (b) that Sterling had the wherewithal to finance the purchase of Parcel A in 1980 solely with drug proceeds, (c) that Sterling employed a practice of forming nominee corporations or using others to purchase property as nominees for his benefit and with his money, (d) that Sterling on multiple occasions caused couriers to deliver large sums of currency from his criminal enterprise to Switzerland, Liechtenstein and the Bahamas during 1980 and 1981; and (e) that the purchase money for the closing of Parcel A was received by a bank in this country from the RBC in Nassau through an account controlled by a Sterling co-conspirator.[8]

Plaintiffs, under *Burgundy Road*, must show more than a mere presumption of ownership, to prove their superior right to the Golden Beach real estate. Plaintiffs have not satisfied their burden of showing the source of the purchase money paid at the closing of Parcel A on November 3, 1980. The only admissible evidence submitted by Plaintiffs in support of their allegation that the purchase money was not from drug proceeds is the testimony of Sterling and Ingold that they were present when a third individual, Passos, agreed to supply the cash needed to close the purchase of Parcel A. Passos, himself, refused to state the source of the $100 United States notes he claims he turned over to

a courier. There is no direct evidence that this alleged money ever reached Liechtenstein. Absent such evidence, the Court must properly infer that the only source of the funds used to complete the purchase of Parcel A was Sterling or a Sterling enterprise.

As the parties base their claims on primarily circumstantial evidence, the Court has relied upon a series of reasonable inferences to reach its findings of fact and conclusions of law. The standard for determining whether an inference is allowable is generally whether it is reasonable or "whether it is one 'that reasonable and fairminded men in the exercise of impartial judgment' might draw from the evidence." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir.1982) (*quoting Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir.1969)).

Under federal law, this Court may pyramid inferences in reaching its conclusions, so long as such inferences are reasonable. *Daniels*, 692 F.2d at 1324; *Fenner v. General Motors Corp.*, 657 F.2d 647, 650–651 (5th Cir.1981), *cert. denied*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Cora Pub, Inc. v. Continental Casualty Co.*, 619 F.2d 482, 486 (5th Cir.1980). The choice between permissible inferences is for the trier of fact. *Southway Theatres v. Georgia Theatre Co.*, 672 F.2d 485, 495 (5th Cir.1982) (Unit B).

Applying these principles to the facts of this case, the Court finds that the testimony of the witnesses, together with the documentary evidence produced at trial, prove that the Golden Beach property was purchased with proceeds of illegal activities and was properly subject to forfeiture under 21 U.S.C. § 848(a)(2). Based upon the evidence at trial, the Court concludes that the United States is entitled to the proceeds

8. This proof is also consistent with 21 U.S.C. § 853(a) which provides that if the government establishes by a preponderance of the evidence that the criminal defendant (1) acquired the property at, or reasonably after, the period of the violation and (2) had no other likely source for the property other than the violation, then a rebuttable presumption is created at trial that property such as Sterling's is subject to criminal forfeiture. Such circumstantial evidence may be used where, as here, direct evidence that particular property of a defendant was purchased with proceeds of illegal drug transactions cannot be obtained.

from sale of the property. Accordingly, it is hereby

ORDERED AND ADJUDGED that Plaintiffs Ramaria Familienstiftung and Unpedantic, INC. shall take nothing by this action and the Defendant United States of America shall go hence without day.