**SOUTHWAY THEATRES, INC.,**
**Plaintiff-Appellant,**

v.

**GEORGIA THEATRE COMPANY, et al.,**
**Defendants-Appellees.**

**No. 80–7672.**

United States Court of Appeals,
Fifth Circuit.*
Unit B

April 5, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Schreader, Wheeler & Flint, Warren O. Wheeler, David H. Flint, Mary Jo Workman, Atlanta, Ga., for plaintiff-appellant.

Troutman, Sanders, Lockerman & Ashmore, June Ann Kirkland, Tench C. Coxe, Atlanta, Ga., for Paramount Pictures Corp.

Jones, Bird & Howell, Kevin E. Grady, Atlanta, Ga., for Storey Theatres, Inc.

Hansell, Post, Bandon & Dorsey, Lee Trammell Newton, Jr., Atlanta, Ga., for Georgia Theatre.

Donovan, Leisure, Newton & Irvine, A. Vernon Carnahan, New York City, and King & Spalding, Joseph B. Haynes, Atlanta, Ga., for Buena Vista Distribution Co., Inc.

Before GEWIN,** HILL and HATCHETT, Circuit Judges.

JAMES C. HILL, Circuit Judge:

The appellant, Southway Theatres, is the owner of the Jonesboro Twin Movie Theatre, which is located in the southern part of the metropolitan Atlanta area. In a private antitrust action brought under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section 4 of the Clayton Act, 15 U.S.C. § 15, Southway alleged that the appellees— [1] competing Atlanta theatre chains and national film distributors—conspired to deprive Southway of the opportunity to license first run films and sought to eliminate it from competition in the licensing and exhibition of those films. The district court entered summary judgment for the defendants. We reverse based on the district court's use of a standard which overstated the burden which Southway must meet in order to survive a motion for summary judgment, and we remand for the application of the proper standard.

## I. The Facts [2]

### A. Organization of the Motion Picture Industry

The parties form part of a tripartite system of film production and marketing in the United States. At the originating level, production companies are responsible for the financing and creation—at least eco-

** Judge Gewin was a member of the panel that heard oral argument in this case and participated in the consideration of the case, but his death occurred before the case was decided.

1. The appellees include Buena Vista Distribution Co., Columbia Pictures Industries, Inc., Twentieth Century-Fox Film Corp., Paramount Pictures Corp., United Artists Corp., Universal Film Exchanges, Inc., Warner Brothers Distributing Corp., Georgia Theatre Co., Storey Theatres, Inc., Weis-Theatres, Inc., and Capri-Fine Arts Theatres, Inc.

2. The portion of this opinion which discusses the factual background of the case is taken almost verbatim from the district court's order of June 30, 1980, in which the court granted the motion for summary judgment filed by United Artists but denied the motions filed by the other defendants. On July 31, 1980, on a motion for reconsideration, summary judgment was entered in favor of all named defendants.

nomically—of motion pictures. They market the films to exhibitors through distribution companies, which they control. Each distributor defendant in the lawsuit is affiliated with a producer and distributes the producer's films. Although the motion picture industry was once vertically integrated, court decrees have forced distributors and producers to divest themselves of ownership in theatres. *See* M. Conant, *Antitrust in the Motion Picture Industry*, 88–112 (1960). ·

Southway has sued the seven major distribution companies operating in the United States. It states that these defendants handle films accounting for over 85% of total national box office revenue each year. Each distributor defendant operates nationwide and maintains branch offices in approximately thirty "key" cities. Atlanta is a key city and the distributors' offices in Atlanta do business in Georgia and portions of Tennessee and Alabama.

The distributors market motion pictures to theatre owners, who are known as exhibitors. Southway distinguishes between two kinds of exhibitors, the "circuits" and the "independents." Circuits are chains of theatres under common ownership, while independent theatres are individuals unaffiliated with any circuit. Under Southway's view of the case, the circuits wear ·black hats and the independents wear white hats: Southway accuses the circuits, who allegedly have greater bargaining power, of inducing distributors not to provide the independents with desirable films. The exhibitor defendants—Georgia Theatres Company, Storey Theatres, Inc., and Weis-Theatres, Inc.—own most of the theatres in the Atlanta region.

Motion picture distributors market their films by licensing the right to exhibit them for a specified amount of time. The exhibitor rents a print of the film along with a copyright license of limited duration. Licensing agreements generally provide for payment to the distributor of a percentage of the gross box office profits earned by each exhibitor, and often also include a guaranteed minimum to be paid regardless of the success of a film. Under this system the distributors retain a direct interest in the profitability of each picture, and they carefully control the availability and distribution patterns of films so as to maximize return.

Films are ordinarily released in three runs, known as first run, intermediate run, and wide break. A first run will produce greater box office profits than subsequent runs and is therefore the most desirable run for an exhibitor. The distributor is in turn able to exact proportionately higher license terms for a first run film. First runs are often accompanied by major publicity campaigns financed solely by the distributor or collectively by the distributor and one or more licensed exhibitors. First run films are often limited to centrally located, well-known theatres. A particularly desirable film may be given an exclusive first run, which is limited to a single theatre. In a restricted first run, the film is licensed to several theatres. In a multiple first run, a still larger number of theatres will exhibit a film. A distributor will usually license a film to a smaller number of exhibitors on first run than on intermediate run; distribution is, in turn, more limited on intermediate run than on wide break.

### B. Licensing Procedure

Motion picture distributors frequently license films by competitive bidding. Under this system, exhibitors in a marketing area defined by the distributor are asked to submit bids stating the percentages and guarantees each exhibitor will pay for the film being offered. The distributor selects the most lucrative combination of bids. If it is unsatisfied with some or all of the bids it has received, it may enter into negotiations with individual exhibitors in the hopes of receiving a more profitable agreement. Defendant Buena Vista Distribution Company, which distributes Walt Disney films, has described in some detail the procedure it follows during the bidding process. We will describe these procedures below because they are typical of the practice followed by all of the distributor defendants.

After an availability date has been determined for first or intermediate run of a picture in greater Atlanta, Buena Vista's Southeastern District Manager mails out "Requests for Offer" to all exhibitors on the company's current first or intermediate run bid list for the region. Each Request for Offer advises the exhibitor of the availability date of the picture and may suggest minimum terms for a bid. It also states that the bid must be sent by the exhibitor directly to Buena Vista's Home Office in Burbank, California, by a certain date. Buena Vista furnishes special pre-addressed envelopes for the exhibitors to use in sending in their bids. If a bid is received in Buena Vista's Atlanta office, it is not forwarded, but is returned to the exhibitor with a reminder that all bids must be submitted directly to the Home Office.

Once they arrive at Buena Vista's Home Office, envelopes containing bids are stamped with the date and time of receipt and are retained unopened by Buena Vista's Legal Department until the scheduled moment for the opening of all bids. At that time, any bidding exhibitor may be present and may inspect all of the bids submitted. An unsuccessful bidder may later inspect all of the winning bids for 14 days after the date of its rejection letter.

The decision as to which bids, if any, Buena Vista will accept, is made by the General Sales Manager. He often contacts local managers, who receive copies of bids, for recommendations and advice concerning local exhibitors. According to Buena Vista, the General Sales Manager will consider, among other factors, "the theatre's past grossing history; the theatre's size, location, appointments for the comfort of its patrons, and suitability for the exhibition of . . . motion pictures such as those distributed by Buena Vista; and the percentage film rental terms offered and guarantee offered, if any."

Buena Vista, as all of the distributor defendants, maintains that it awards licenses to the theatre or combination of theatres which, in its judgment, will return the greatest film rental. Buena Vista claims to make its licensing decisions unilaterally, without consulting any other distributor or any exhibitor. Each license is supposedly awarded on an "individual picture-by-picture and theatre-by-theatre basis." Buena Vista denies giving preference to any theatre because it is part of a circuit.

If Buena Vista is unsatisfied with the results of competitive bidding it will usually attempt to license films through direct negotiations with exhibitors. Bidding and negotiation are not mutually exclusive practices: the distributor may accept several bids but wish to license more theatres in the Atlanta area. It will then contact the unsuccessful bidders [3] and attempt to negotiate directly with each for rental terms superior to what was offered in the bidding.

Negotiations are conducted locally by Buena Vista's Southeastern District Manager or Atlanta Branch Manager. They will solicit new, hopefully higher, bids from the exhibitors and will pass the bids on to the home office. The negotiations are conducted orally, although an exhibitor's offer is memorialized in a signed "Confirmation of Negotiated Bid Offer." Buena Vista claims that it negotiates individually with each exhibitor without disclosing the terms of any other exhibitor's negotiated offer. Again, it also claims that each negotiated offer is evaluated separately so as to produce the highest revenue for each film and without consultation between Buena Vista and any other distributor or exhibitor.

Because its return from each theatre ordinarily derives from a percentage of the theatre's revenue, Buena Vista has a direct interest in the box office success of the films it licenses. The parties agree, however, that the distributors do not dictate the admission prices that exhibitors may

---

3. A successful bidder may have obtained a promise from the distributor not to license the same film to other nearby theatres concurrent with, or subsequent to, its run at the bidder's theatre. This arrangement is known as a clearance. The owner of a theatre that was cleared by a successful bidder will not be invited to join in negotiations.

charge. Buena Vista insists it does not make adjustments in any guarantee which it has negotiated with an exhibitor, no matter how poorly a film performs.

### C. The Jonesboro Twin Theatre

Appellant Southway Theatres, Inc. was formed in 1972 for the purpose of constructing and operating a shopping center which is located in the southern Atlanta metropolitan region and which houses the Jonesboro Twin Theatres. The shopping center is situated some 15 miles from the city limits and lies close to the residential areas of Forest Park, Morrow, Jonesboro, and Riverdale in Clayton County, Georgia. When the Jonesboro Twin first opened on September 14, 1973, no other theatres were located in its direct vicinity. The nearest theatres were the South Expressway drive-in and the Old Dixie Theatre, in Forest Park.

Southway's President, James T. Patterson, operated the Jonesboro Twin. Mr. Patterson assumed this responsibility with virtually no previous experience in the motion picture industry, although he had consulted with several other exhibitors in Georgia. He initially engaged William Andrew of the Southern Independent Theatres booking agency to obtain films for the Jonesboro Twin. In November 1973 Mr. Patterson began to handle bookings on his own.

Southway opened with hopes of obtaining first run films. Patterson recognized that theatres located near, but not in, Atlanta usually could not obtain first run or intermediate run films. Atlanta's suburban theatres ordinarily waited their turn to exhibit films on wide break only, with earlier runs limited to the central theatres. Patterson hoped, however, that Southway would be deemed by the distributors to lie completely outside of the Atlanta region and therefore incapable of attracting customers from Atlanta. He hoped Southway would thus be allowed to show first run films "day and date" (that is, concurrently) with Atlanta. The distributors had afforded this status to theatres in Marietta, Georgia, a suburb lying to the north. When Mr. Patterson took over the responsibility for buying films, he expressed his desire for access to first run films to some of the distributors.

During the period encompassed by this suit, Southway encountered little luck obtaining anything but wide break films. Most of the distributors—Buena Vista, United Artists, Warner Brothers, Fox, and Paramount—never licensed a single first run film to Southway. Universal and Columbia each licensed one film on first restricted run. Some of the distributor defendants licensed a small number of intermediate run films to Southway.

For a portion of the relevant period the distributor defendants refused Southway even the opportunity to bid for first and second run films. United Artists never allowed Southway to bid for films that were playing in Atlanta. The remaining distributors began accepting bids between the summer of 1974 and fall of 1976.[4]

While it is clear that the decisions of the distributor defendants to allow Southway to bid for first run films came as a result of requests from Mr. Patterson, the parties have disagreed as to the nature of the communications and as to the genuineness of Patterson's interest in competing for films against the close-in Atlanta theatres. In November 1973, when Mr. Patterson took over William Andrew's booking responsibilities, he wrote to all of the distributor defendants asking that they put Southway on their mailing lists. In 1974 and early 1975, Mr. Patterson spoke at least ten times to

4. Fox was the first distributor to accept bids from Southway. It allowed Southway to bid for first non-exclusive and intermediate runs in July 1974. Buena Vista began accepting bids for first and intermediate runs in April 1975. Columbia began to include Southway in bidding for intermediate runs in April 1975 and for first runs in November 1975. Universal permitted Southway to bid for first and intermediate runs in May 1975. Paramount added Southway to its lists for first non-exclusive and intermediate runs in May 1975, and for first exclusive runs in the spring of 1976. Warner allowed Southway to bid for first unrestricted runs and intermediate runs in the summer of 1975. It did not send bid solicitations to Southway, however, until October 1975 for intermediate runs, and for the fall of 1976 for first unrestricted runs.

representatives from each distributor, requesting that Southway be offered films on as early availability as possible.

The parties have disputed the correct characterization of those requests. The defendants claim that Patterson never really wanted to bid for films. Southway believes that his interest in bidding was genuine and apparent; although bidding was not Southway's first choice—it would have preferred the opportunity to negotiate for films independently of the Atlanta theatres, as the Marietta exhibitors did—it was nevertheless entirely willing to follow the alternate route and join in competitive bidding as part of the Atlanta area. Because Patterson's oral communications were largely unavailing, he sent out a second letter to all of the distributors (except for Fox, which had allowed Southway to bid since 1974) on March 27, 1975. It was soon after this date that the remaining distributors began to accept bids from Southway. Southway apparently believes that the filing of the lawsuit, on August 20, 1975, also explains the decisions of some distributors to include it in the bidding process.

The parties have vigorously disputed the Jonesboro Twin's attractiveness to the public. The defendants argue that it is small, and indeed its overall capacity stands somewhat below the average for Atlanta theatres. Southway responds that it is more than sufficient in every respect; that it is clean, solidly constructed, and well located. Southway also lays claim to some evidence that the Jonesboro Twin is superior to its nearby circuit competitor, the Arrowhead.

When Southway planned, built, and opened the Jonesboro Twin, it faced little competition from neighboring theatres. The South Expressway drive-in and the old Dixie Theatre were also independent theatres and had not been exhibiting first run films that Southway coveted. In December 1974, however, defendant Weis Theatres opened its Arrowhead Theatre in a shopping center 2½ miles north of the Jonesboro Twin. From the start, the Arrowhead succeeded in licensing major first run films. During the relevant period, it attracted such films as "Godfather Part II" (Warner), "Jaws" (Universal), and "King Kong" (Paramount). By comparison, the Jonesboro Twin was licensed only two first run films, "Swashbuckler" and "Baby Blue Marine." Southway characterizes these films as "stiffs." No other independent theatre in Clayton County obtained a single film on first restricted run during the relevant period.

## II. *The Antitrust Issues*

■ Southway has contended that its factual allegations showed a conspiracy which deprived it of first run films. The district court, in analyzing the issues before it, organized the allegations into two categories of evidence, "practices" proof and "pattern" proof.

The practices proof consisted of actions by the distributors that Southway insists would not have been taken in the absence of a conspiracy. Southway claims that the distributors have: (1) refused to permit Southway to bid for films; (2) rejected bids from Southway in favor of inferior bids from circuit exhibitors; (3) permitted irregularities in the bidding process, including (a) accepting late bids from circuits, (b) ignoring bids and licensing films by negotiation, (c) affording circuit exhibitors access to the terms of Southway's bids to permit the circuits to formulate superior bids, and (d) excusing circuit exhibitors (but not Southway) from paying guarantees; and (4) providing secret information regarding unreleased films to circuit exhibitors.

The second variety of evidence, termed pattern proof, involved Southway's claims that an examination of which films played in major Atlanta theatres showed that certain distributors consistently "paired off" with certain exhibitors. Through a part of this evidence, Southway tried to show the existence of a "split," an arrangement in which exhibitors divide the supply of available films so that each exhibitor bids for, or exhibits, only the films of a particular distributor. Moreover, Southway believes the exhibition pattern in Atlanta, called the "playoff," proves not only that the exhibitors arranged a split but also that the dis-

tributors acquiesced in the arrangement. Southway further argues that a component of the Atlanta split included an agreement to exclude independent exhibitors from obtaining films covered by the split.

Because Southway and some of the defendants briefed their motions for summary judgment on largely factual grounds, it was necessary for the district court to take an active role in characterizing the antitrust issues which were placed before it. The court determined that the factual allegations fit the framework of a boycott and analyzed the case accordingly. Its thoughtful analysis is appended to this opinion, and we need only to discuss and clarify a couple of the issues which the court covered.

■ First, we agree with the district court's position that Southway's claims should be characterized as alleging a boycott theory, *see* appendix, and we reject the appellant's contention that the court erred in its view of the case.[5] As to the appellant, the alleged split agreements among the circuit theatres do not constitute an independent violation of the antitrust laws. Anti-competitive injury would result to a theatre excluded from participation in the split agreements only if the distributors cooperated by licensing films only to the participants. Without such action by the distributors, the only effect of the splitting arrangements would be to reduce the competition against which Southway would be bidding in the attempt to obtain films.

■ Second, we believe it is unclear whether Southway has alleged a conventional conspiracy among the motion picture distributors. As the district court correctly observed, a combination among the distributors would not have been necessary to effectuate the conspiratorial splitting arrangement in which the exhibitors allegedly engaged. The alleged boycott could have been the result of coerced acquiescence on the part of each distributor; conspiring circuit exhibitors could have somehow induced each distributor to cut off its supply of first run films from independent exhibitors. On the other hand, Southway may have asserted that the suppliers allegedly being coerced also conspired together. The allegations would to that extent echo the theory pursued by the plaintiff in *Klors, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

The distinction between a conventional conspiracy theory and a coerced acquiescence theory makes little difference, however, with regard to the process of determining from circumstantial evidence whether a boycott may have occurred in this case.[6] Whether a refusal to deal resulted solely from the inducement of each distributor by conspiring circuit theatres or whether it also involved a horizontal conspiracy at the distributor level, the distributors' conduct would have been parallel. Thus the task of the district court on the motion for summary judgment was to examine the circumstances surrounding the parallel failures to deal alleged by Southway.[7]

5. When describing boycotts, the court observed that such concerted activity is *per se* violative of the Sherman Act. Whether that is always true is not a question before this court because it was not raised by the parties. Moreover, the district court was not presented with the question. None of the defendants raised the issue by asserting any justification for the anti-competitive conduct which Southway alleged; instead they simply denied the existence of a boycott. In approving the district court's analysis, then, we are not deciding when the *per se* rule applies to a boycott case and when it does not. This question, which has become more troublesome after *Broadcast Music v. Columbia Broadcasting System*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (holding that the price-fix-

ing allegation there should be assessed under the rule of reason), must be saved for a later day.

6. The refusal to deal which would be involved under either theory would constitute a boycott. "It does not matter how the end is achieved, if one or more firms is deprived of suppliers or customers (or other essential trade relationships) by concerted action among other firms aimed at keeping the victim firms from competing, the arrangement is in purpose and effect a boycott." L. Sullivan, *Handbook of the Law of Antitrust* 231 (1977).

7. The district court indicated that the doctrine of conscious parallelism is largely insufficient

### III. The Standard for Summary Judgment

On appeal, Southway primarily asserts that the district court applied the wrong standard in reviewing the evidence on the motion for summary judgment. It contends that the court usurped the role of the jury and adjudicated the case on affidavits, as shown by the court's own formulation of its standard:

> In motion picture antitrust cases, where circumstantial proof of conspiracy often includes scrutiny of the defendant's business decisions, courts have weighed the logical value of inferences that may be raised from the record. The plaintiff attempts to show that the defendant's acts can only be explained as conspiracy or inconceivably bad business judgment. The cases have undertaken inquiry, on summary judgment, as to whether the inferences raised from the evidence actually suggest bad judgment any more than good. Unless the former conclusion is, as a logical matter, stronger than the latter, the case will not be allowed to proceed further.

■ The district court properly observed the necessity for making some assessment of the inferences that Southway wishes to be drawn from the circumstantial evidence.[8] The party opposing a motion for summary judgment is entitled to the benefit only of *reasonable* inferences that may be drawn in its favor. *General Chemicals v. Exxon Chemical Company, U.S.A.*, 625 F.2d 1231, 1233 (1980); *American Telephone & Telegraph Company v. Delta Communications Corp.*, 590 F.2d 100, 102 (5th Cir.) (per cu-

riam) (on petition for rehearing), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). Some scrutiny is thus required to determine whether the facts are susceptible of the interpretation which Southway seeks to give them in light of the defendants' evidence contradicting Southway's allegations. *See* Fed.R.Civ.P. 56(e); *First National Bank v. Cities Services*, 391 U.S. 253, 280, 289, 88 S.Ct. 1575, 1588, 1592, 20 L.Ed.2d 569 (1968).

■ This court has previously described the proper extent of a court's assessment of the inferences in this matter:

> Insofar as any weighing of any inferences from given facts is permissible, the task of the court is not to weigh these against each other but rather to cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness, casting aside those which do not meet it and focusing solely on those which do.

*American Telephone & Telegraph Company*, 590 F.2d at 102. A comparison of this language and the standard enunciated by the district court indicates that the weighing process in which it engaged was impermissible.[9]

Some of the appellees argue, however, that the Supreme Court weighed the probability of possible inferences against each other in *Cities Services*, 391 U.S. at 280, 88 S.Ct. at 1588, and they contend that the case fully supports the district court's holding that summary judgment is proper when an inference of nonconspiracy is more probable than the plaintiff's asserted inference

---

for the task of showing a boycott conspiracy indirectly. *See* Appendix at 501. We agree that parallelism demonstrates little when a refusal to deal is the wrong complained of, but we believe that this means only that courts must demand more from the evidence of circumstances surrounding such a refusal.

8. In the course of discovery, Southway obtained one letter—sent from a circuit theatre to a distributor—which may suggest the existence of some type of exclusionary practice and which was labeled "direct evidence" in the district court proceedings. However, it does not explicitly refer to an understanding between

exhibitors and distributors, and its implicates only one exhibitor and one distributor. Because one must still infer a conspiracy from the letter, the letter is circumstantial evidence as to the alleged boycott.

9. The language used by the district court may suggest that the motion picture antitrust cases may receive special treatment by the courts. Fed.R.Civ.P. 56 makes no such distinction though. Summary judgment procedures pursuant to the rule must apply equally to all actions. *Aladdin Oil Company v. Texaco, Inc.*, 603 F.2d 1107, 1110–12 (5th Cir. 1979).

of conspiracy. Admittedly, *Cities Services* gives us pause, but we believe that an analysis of the Court's opinion reenforces the view we expressed in *American Telephone & Telegraph.*

In *Cities Services,* the Supreme Court dealt with a case involving issues similar to those now before us. The plaintiff had unsuccessfully attempted to sell Iranian Oil to several major oil companies; he alleged that his attempts were frustrated by a world-wide conspiracy to boycott Iranian oil. The Supreme Court was reviewing the grant of summary judgment with respect to one defendant, Cities Services.

In order to demonstrate participation by Cities Services in an alleged conspiracy, the plaintiff produced facts showing an abrupt decision by Cities Services not to purchase Iranian oil despite extensive negotiations with the plaintiff and despite the attractiveness of the plaintiff's offer. The defendants produced evidence tending to explain the non-dealing as the result of independent business judgment. The Court found that Cities Services had demonstrated a sufficient business justification for its behavior, and it upheld summary judgment.

With respect to the facts showing a refusal to deal, the Court concluded:

> Therefore, not only is the inference that Cities' failure to deal was the product of factors other than conspiracy at least equal to the inference that it was due to conspiracy, thus negating the probative force of the evidence showing such a failure, but the former inference is more probable.

10. The complete statement of law has been articulated by the Third Circuit in this manner: "[P]roof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or expressed, can be inferred but . . . such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of rational, independent choice less attractive than that of concerted action." *Bogosian v. Gulf Oil Corporation,* 561 F.2d 434, 436 (3d Cir. 1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). *See generally Ambook Enterprises v. Time, Inc.,* 612 F.2d 604, 613–15 (2d Cir.

*Id.* at 280, 88 S.Ct. at 1588. In this discussion, the Court undeniably weighed competing inferences against each other. We believe, though, that the context in which the quotation appears shows that the Court was merely applying a presumption of antitrust conspiracy law, a basic rule that the inference of a conspiracy is always unreasonable when it is based solely on parallel behavior that can be explained as the result of the independent business judgment of the defendants.[10]

■ Our view of the language in *Cities Services* is confirmed by the inquiry the Court conducted after its statement about the probability of competing inferences. The court examined "other evidence besides the simple failure to deal," 391 U.S. at 280, 88 S.Ct. at 1588, evidence which was intended by the plaintiff to show that the refusal to deal occurred under circumstances that would indicate a conspiracy. Assessing this other evidence, the court determined that it was not reasonably susceptible of the interpretation sought to be placed on it by the plaintiff and that it added nothing to the conspiracy allegations. Consequently, "the only evidence" of participation in a conspiracy was the plaintiff's "allegation that the failure to deal resulted from conspiracy." *Id.* at 289, 88 S.Ct. at 1592. Since the mere recitation of facts suggesting a parallel refusal to deal has no significant probative force where the defendants can fully explain how independent business judgment would have led to such a refusal, a trial court may properly grant the defendants' summary judgment motions in a case where such facts constitute "the only evidence" put forward.[11] *See, e.g., Dahl, Inc. v. Roy*

1979). 2 P. Areeda and D. Turner, Antitrust Law § 317 at 83 (1978).

11. In some situations where a conspiracy is alleged, but not here, the behavior of the defendants may necessarily be interdependent. *See, e.g., Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 222, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939) ("[W]ithout substantially unanimous action with respect to the restrictions for any given territory there is a risk of a substantial loss of the business and good will of the subsequent run and independent exhibitors, but . . . with it there was the prospect of increased profits."). Even in such a case, there

*Cooper Co.*, 448 F.2d 17, 20 (9th Cir. 1971) (Additional aspects of the case did not demonstrate impropriety thus plaintiff had "failed to advance any further evidence which would allow any inferences of conspiracy.").

Had the trial court in this case applied its standard only to business behavior involving a parallel refusal to deal, its analysis would have been proper. It appears, however, that its standard for assessing the inferences was applied to each piece of evidence which Southway put forward to support its conspiracy theory.[12] *See* 1980–2 Trade Cas. ¶ 63,546 at 76,924–25. We do not agree with the appellees' contention that *Cities Services* supports that analysis.

■ As our discussion indicates, the plaintiff's burden when responding to a properly supported summary judgment motion is to offer significant probative evidence tending to support the complaint. *See Pan Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 553–55 (5th Cir. 1980); *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1112 (5th Cir. 1979). If reasonable inferences drawn from all of the evidence—which must be viewed in the light most favorable to the plaintiff—indicate the existence of a conspiracy, the plaintiff has introduced a sufficient basis for proceeding to trial. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). The ultimate inference that a conspiracy existed need not be more probable than the inference that the refusal to deal resulted from independent business judgment. "Where more than one reasonable inference can reasonably be drawn from the proof, it is for the jury to determine the proper one."

*Bordonaro Brothers Theatres v. Paramount Pictures*, 176 F.2d 594, 597 (2d Cir. 1949). Where the additional evidence put forward by the plaintiff is not sufficiently probative, though, the plaintiff's desired inferences fail when measured against "the abstract standard of reasonableness." There is, in such a case, no genuine issue of material fact. *See generally, e.g., Solomon v. Houston Corrugated Box Co., Inc.*, 526 F.2d 389, 393–94 (1976).

■ In the case before us, Southway has offered evidence which, it contends, is probative of a conspiracy involving a cooperative response by the distributors to a splitting arrangement by the circuit theatres. Southway has attempted to demonstrate that the distributors' explanations of their refusals to deal are unbelievable and that the distributors were responding to an invitation from exhibitors to participate in a conspiratorial plan. In doing so, Southway has pointed to evidence other than those facts which are the foundation for its allegation of a refusal to deal. For example, Southway's evidence indicates that the distributors defined the markets within the Atlanta area in the same manner; such uniform definition may represent evidence of a traditional conspiracy. A letter of complaint sent from one circuit theatre to one distributor was offered as an indication of pressure by the defendant exhibitors.[13] Evidence offered to indicate that the distributors responded to the alleged invitation by the exhibitors includes the distributors' willingness to deal with the Weis Arrowhead, a circuit theatre which is near the Jonesboro Twin and which Southway contends is comparable to the Twin. Irregu-

may be some question concerning the relationship of interdependence and collusion. *See* Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach*, 21 Stan.L.Rev. 1562 (1969); L. Sullivan, *Handbook of the Law of Antitrust* § 122 (1977).

12. Citing *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962), the appellant also contends that the district court's methodology involved improper compartmentalization of its proof. Since the proper application on

remand of the summary judgment standard we have outlined will eliminate any compartmentalization problem that may have existed, it is unnecessary for us to deal fully with this contention. However, we do emphasize that while the district court must analyze each piece of evidence, the question on summary judgment is whether a reasonable inference of conspiracy is raised from all the evidence viewed as a whole.

13. *See* note 8 *supra*.

larities in bidding practices, Southway argues, also indicate participation by the distributors.[14]

To decide the summary judgment motion made by the defendants in this case, it must be determined whether the additional facts supporting Southway's allegations constitute significant probative evidence that will support a reasonable inference of a conspiracy when joined with the evidence of a parallel refusal to deal. We choose to remand to the district court for this determination. Though the question posed is a matter of law upon which we might rule, we believe that it would be unwise for us to make the initial decision on the summary judgment motion under the standard we have outlined.

### IV. *Conclusion*

In sum, then, we hold that Southway's contentions are properly viewed as alleging a boycott, and we remand for reconsideration of the defendants' motions for summary judgment. Remand is ordered because we have found fault with the methodology employed by the district court in its earlier rulings. By requiring Southway to show that the evidence it produced must be more probative of conspiracy than innocent behavior, the district court overstated the burden which Southway is required to meet in order to resist a summary judgment motion. Competing inferences should not be weighed against each other at this stage of the proceeding. Instead, the district court must view all of the evidence in the light most favorable to the plaintiff and test whether the inference of a conspiracy is reasonable. If the evidence supports such an inference, there is a genuine issue of material fact and the plaintiff is entitled to proceed to trial. We emphasize that our disposition of this case does not reflect any disapproval of the ultimate findings by the district court; we express no opinion as to how it should now rule.

### REVERSED and REMANDED.

---

14. *But see, e.g., Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 886–87 (8th Cir., 1978) (affirming directed verdict for defendants); *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 20 (9th Cir. 1977).

### APPENDIX

## ANTITRUST ANALYSIS OF THE DISTRICT COURT [15]

Southway charaterizes the facts it believes it can prove primarily by reference to the Supreme Court decision in *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). The *Paramount* case, which we will review below, is indeed a leading decision in the field of antitrust and the motion picture industry; the Court discussed at length a host of questionable practices, explained their anticompetitive nature, and determined which were to be outlawed by the lower courts. Southway's approach in this suit is largely to claim that the defendants acted in a manner proscribed by the decrees entered in Paramount. Because the structure of the motion picture industry and the law of antitrust have evolved since *Paramount,* however, Southway's invocation of that decision fails in large part to solve the problem of how to characterize the facts that Southway wishes to prove. We are left with Southway's factual accusations, but a certain uncertainty as to how, why, or when those accusations create antitrust liability.

The defendants, of course, cite other cases in order to challenge the legal effect of Southway's accusations. Several recent decisions have entered or affirmed summary judgments or directed verdicts in conspiracy cases resembling this one. Naturally, the defendants have been quick to invoke decisions finding the evidence insufficient to prove an antitrust conspiracy. Perhaps because the subject matter remains somewhat abstract, however, no party investigates in detail the extent to which each of Southway's allegations shows a conspiracy whose purpose or effect is so anticompetitive as to warrant *per se* or other treatment under the antitrust laws.

---

15. This appendix represents a major portion of the district court's characterization and analysis of the antitrust issues in this case. All original footnotes have been retained but have been renumbered (i, ii, iii, etc.).

If the record conclusively showed that no defendant had conspired with any other, there would be no need for such an exercise. Similarly, if there were incontrovertably an agreement among every defendant to put Southway out of business, it would be obvious that such a scheme would be *per se* illegal. The record, however, suggests that Southway will only be able to establish some set of facts lying between these polar alternatives. It therefore becomes necessary to decide what the plaintiff must prove, ultimately to show an antitrust violation and presently to survive summary judgment. The purpose of this discussion, therefore, will be to establish the minimum that Southway must be able to prove in order to establish an antitrust violation. Following a brief review of the *Paramount* case, we will discuss the particular antitrust theories available to Southway, and the factual predicates that they require. We will turn, subsequently, to the standards for summary judgment in antitrust cases and, finally, to an evaluation of the factual record.

The structure of the contemporary motion picture industry, and the conduct of its players, has been greatly affected by the decrees entered in connection with the Supreme Court's decision in *United States v. Paramount Pictures*. Those orders were once described as the greatest economic victory ever achieved by the Department of Justice. *See* Adams, *Dissolution, Divorcement, Divestiture: The Pyrrhic Victories of Antitrust*, 27 Ind.L.Rev. 1, 5 (1951). The case was commenced in 1938, a consent decree was entered in 1940, and the controversy reactivated by the government, which was unsatisfied with the consent provisions, in 1944. The defendants were (1) the five major film producer-distributors and their exhibitor-subsidiaries; (2) two smaller producer-distributors; and (3) a distributor which did not produce motion pictures. At the time the five "majors" controlled more than 70 per cent of the first run theatres in the nation's 92 largest cities, those with a population exceeding 100,000. *See* Conant, *supra*, at 50. When called upon finally to rule in the case, the district court condemned, among others, the following practices:

1. The specification, in film licenses, of admission prices. The district court held this to be vertical price fixing and added that the uniformity in admission prices contained in the contracts between each of the defendant distributors and a given exhibitor sufficed to imply a horizontal price fixing conspiracy among the defendants.

2. The allowance, in licensing agreements, of unreasonable clearances. Reasonable clearances were those not unduly extended as to time or duration.

3. The making of formula deals and master agreements, in which films were licensed to circuits, rather than individual theatres.

4. Block booking, in which sale of one film was tied to sale of one or more other films.

5. The inclusion, in licensing agreements with circuit exhibitors only, of terms favorable to those exhibitors. *See United States v. Paramount Pictures*, 66 F.Supp. 323 (S.D. N.Y.1946).

From these acts the district court found an attempt to monopolize distribution and exhibition of motion pictures, and identified various conspiracies in restraint of trade. Along with outlawing, in large part, the offending practices, the court mandated a system of competitive bidding in which each theatre's offer for a particular film had to be considered individually, and the most lucrative offer accepted. 66 F.Supp. at 358.

The system of competitive bidding put in place by the district court—and claimed to represent the actual practice by the defendants—was the most significant part of that court's decision of which the Supreme Court disapproved. Although the Court concurred with the majority of the district court's conclusions, and the relief it entered, the Court found impractical any scheme of judicial surveillance and evaluation of the bidding process. The complexities and subtleties of comparing bids, often containing both percentages and straight figure guarantees, from different theatres did not easi-

ly admit of court supervision. Quoting one of the parties, the Court held

Each film is to be licensed on a particular run to "the highest responsible bidder, having a theatre of a size, location and equipment adequate to yield a reasonable return to the licensor." The bid "shall state what run such exhibitor desires and what he is willing to pay for such feature, which statement may specify a flat rental, or a percentage of gross receipts, or both, or any other form of rental, and shall also specify what clearance such exhibitor is willing to accept, the time and days when such exhibitor desires to exhibit it, and any other offers which such exhibitor may care to make." We do not doubt that if a competitive bidding system is adopted all these provisions are necessary. For the licensing of films at auction is quite obviously a more complicated matter than the like sales for cash of tobacco, wheat, or other produce. Columbia puts these pertinent queries: "No two exhibitors are likely to make the same bid as to dates, clearance, method of fixing rental, etc. May bids containing such diverse factors be readily compared? May a flat rental bid be compared with a percentage bid? May the value of any percentage bid be determined unless the admission price is fixed by the license?"

The question as to who is the highest bidder involves the use of standards incapable of precise definition because the bids being compared contain different ingredients. Determining who is the most responsible bidder likewise cannot be reduced to a formula. The distributor's judgment of the character and integrity of a particular exhibitor might result in acceptance of a lower bid than others offered. Yet to prove that favoritism was shown would be well nigh impossible, unless perhaps all the exhibitors in the country were given classifications of responsibility. If, indeed, the choice between bidders is not to be entrusted to the uncontrolled discretion of the distributors, some effort to standardize the factors involved in determining "a reasonable return to the licensor" would seem necessary.

We mention these matters merely to indicate the character of the job of supervising such a competitive bidding system. 334 U.S. at 162–63, 68 S.Ct. at 931–932. Instead, the Court remanded for consideration of the alternative remedy of requiring the defendants to divest themselves of their exhibitor subsidiaries. This plan was ultimately adopted by the district court and affirmed *per curiam* without opinion. *United States v. Paramount Pictures*, 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380 (1950), *aff'g*, 85 F.Supp. 881 (S.D.N.Y.1949).

Southway's fundamental complaint—that the distributor defendants have deprived it of first run films in favor of the defendant Atlanta circuits—might appear merely to echo some of the charges leveled by the government in *Paramount*. Much of the analysis in that case, however, loses its force here because the industry structure has evolved. In *Paramount*, the distributors controlled the circuits. With such vertical leverage, the distributors were attempting to monopolize, or greatly lessen competition, at the exhibitor level. Such practices as admission price fixing, unreasonable clearances, formula deals, and master plans all were intended to injure the competitors of the distributor-owned circuits. The distributors' benefit from the scheme was direct and apparent.

With the elimination of a motion picture industry vertically integrated downward to the exhibitor level, the significance of a distributor's refusal to do business with an independent shifts dramatically. The distributor acts no longer to advance its own interests as a competing exhibitor, but to assist some other exhibitor with whom the distributor merely does business. Southway claims that the distributors have refused to supply first run films at the behest of Southway's competitors. In the post-integration era of the motion picture industry, this allegation essentially charges a boycott.

### A. Boycott

In a conventional boycott, actors at one level seek to protect themselves from com-

petition from non-group members who do business or wish to do business at their level by taking concerted action aimed at depriving the excluded competitors of some necessary trade relationship. *See* L. Sullivan, *Handbook of the Law of Antitrust* 230 (1977). Typically, they combine to induce one or more suppliers, who value the conspirators' patronage, to cut off the target. The act is deemed *per se* violative of the Sherman Act. *See, e.g., Fashion Originators' Guild of America v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

The boycott rule contains several components important to Southway's case. The first is that a combination among boycotting suppliers is not necessary to the cause of action. Ordinarily, of course, all participants involved will enforce the arrangement together. But a boycott exists even if each supplier, without considering the others, agrees to the demands of the target's competitors to cut off the target. The vertical agreement furnishes the element of "contract, combination, or conspiracy" necessary under the Sherman Act. Numerosity of suppliers is needed only to establish that the agreements, taken together, diminish competition sufficiently to be deemed illegal. *See* Sullivan, *supra*, at 260.

Second, the cases establish that a boycott can be carried out with only one participant at the target's level. In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), an appliance retailer was held to have stated a cause of action under the Sherman Act by alleging that a competing retailer conspired with manufacturers to cut off the supply of appliances to the plaintiff. That conduct, if proved, violated the Sherman Act even though the presence of only a single competing conspirator eliminated any likelihood that the manufacturers had been coerced into the boycott and even though the elimination of the plaintiff could not possibly affect price, quantity, or quality in the retail appliance market. Regardless of the market power of the conspiring competitor or group of competitors, the exclusionary conduct, by its very nature, was held "unduly restrictive, and hence forbidden." 359 U.S. at 211, 79 S.Ct. at 708.

Third, the cases do not severely limit the range of inducements from competitor to supplier that will provoke antitrust liability. Ordinarily, a group of competitors will band together and explicitly request a boycott. *See, e.g., United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Alternatively, they may develop an indirect mechanism to achieve the same effect. *See Eastern States Retail Lumber Dealers' Association v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914) (circulating list of boycott targets). No explicit request to boycott and no obvious threat to stop doing business with a competitor need be shown. As professor Sullivan has summarized,

> In some situations the boycotting group does not coerce any supplier or customer not to deal with non-group members by threatening themselves to withhold patronage. Rather, they succeed without such a threat in inducing one or more suppliers or customers to stop dealing with the boycott victim or victims. This might be done in some wrongful way, such as by using fraudulent records to convince a supplier that a non-group member is a bad credit risk. Or it might be done simply by urging the customer or supplier to take the desired course, by saying for example that group members would appreciate it. It does not matter how the end is achieved, if one or more firms is deprived of suppliers or customers (or other essential trade relationships) by concerted action among other firms aimed at keeping the victim firms from competing, the arrangement, is in purpose and effect a boycott.

Sullivan, *supra*, at 230–31.

It is within these contours that Southway must fit the bulk of its antitrust theories. It must prove—and to survive summary judgment it must show it is able to prove—that circuit exhibitors induced distributors not to license first run films to it. The allegations fit a boycott theory neatly, and are aided by the special characteristics of

that theory just noted. Southway need not explicitly show a horizontal agreement among the boycotting distributor defendants. It is not required to prove the participation of more than a single exhibitor defendant in the conspiracy. And it need not show any actual effect on competition at the exhibitor level. Finally, Southway must be afforded some leeway in identifying the communication or understanding between conspiring exhibitors and distributors which led to the boycott.

At the same time, the boycott theory is not infinitely expandable to create liability every time a supplier refuses to service a plaintiff but continues to do business with the plaintiff's competition. Limitations on the boycott argument lessen the legal usefulness of some of Southway's factual allegations, rendering them insufficient to generate antitrust liability.

Within the context of this case, the boycott theory has two principal limitations. The first involves the quantity of actors participating in the scheme. As this number decreases, the conspiracy ceases to warrant *per se* treatment and approaches, and finally attains, legality.

If Southway were able to prove the participation of only a single exhibitor and a single distributor in the claimed conspiracy, we could find little precedent for *per se* treatment. Admittedly, a boycott can be made out where there is only one competing conspirator, *see Klors, Inc. v. Broadway-Hale Stores, Inc.*, or where there is a single competing supplier, *see Eastern States Retail Lumber Dealers' Association v. United States.* But if numerosity is absent at *both* levels, the conspiracy becomes merely an exclusive dealing arrangement, or franchise. Exclusive franchises are not *per se* unlawful, and are permitted so long as they do not have the effect of substantially lessening competition. *See Dillon Materials Handling, Inc. v. Albion Industries Division of King-Seeley Thomas Co.*, 567 F.2d 1299, 1301–02 & n.8 (5th Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 111, 58 L.Ed.2d 127 (1978). Southway has made no attempt to show any tangible effect on competition among exhibitors. Accordingly, if it could prove no more than a single exhibitor-distributor agreement to deprive it of first run films, it would fail, as a matter of law, to establish an antitrust violation.

In between the exclusive dealing arrangement and the grand conspiracy involving all the named defendants lies an intermediate possibility: that a competing exhibitor will be shown to have induced more than one, but fewer than all, distributors to cut off Southway. In that instance, characterization of the scheme will turn on the extent to which Southway was left with substantially the same access to films from the remaining distributors. If it was not, then the effect of the conspiracy equalled a conventional boycott by depriving Southway of trade relationships needed to compete. *See* Sullivan, *supra*, at 260–61.[i] Such a conspiracy, because it is equivalent to a boycott, is *per se* illegal regardless of whether the elimination of Southway affected competition at the exhibitors' level. By contrast, so long as Southway retained a supply of replacements for the lost bidding opportunities, no antitrust liability should attach.[ii]

i. Professor Sullivan suggests that the legality of exclusive franchises also be decided based on whether substitutes are readily available to the excluded trader. This test may be superior to an inquiry into effect on competition: the evil of a boycott, at least after *Klors*, does not depend on an actual detriment to competition, but derives from the unfairness of the arrangement and its effect on access to the marketplace. An exclusive dealing arrangement could contain such undesirable characteristics even though, like a *Klors* boycott, it did not diminish competition. In this case, however, the distinction would not be particularly meaningful. A conspiracy between a single exhibitor and a single distributor would not only leave competition undiminished, but would also preserve an adequate alternative pool of distributors for Southway.

ii. By replacements, we mean non-conspiring distributors who were willing to consider bids from Southway on their merits, even if those distributors did not actually award licenses to Southway.

The second difficulty with using a boycott argument lies in proving the existence of an agreement. The leading boycott cases have all involved conspiracies that were either explicit and admitted to or, because the proceedings had not matured sufficiently, were simply assumed to be provable. *See, e.g., Klors*, 359 U.S. at 209, 79 S.Ct. at 707. These cases have resolved questions involving the scope and applicability of the boycott theory, rather than the means by which a violation could be made out. Here, by contrast, Southway has progressed with little in the way of direct evidence; it seeks to prove virtually the whole of its case circumstantially.

Antitrust law has freely embraced the practice of proving a conspiracy with circumstantial evidence. The leading case on inferential proof of price fixing involved the motion picture industry. In *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), the Supreme Court upheld a finding of concerted action by eight film distributors where all acted identically, each knew what the others were doing, and the profitability of the actions of each demanded unanimity. The rule of "conscious parallelism and plus factors," *see C–O Two Fire Equipment Co. v. United States*, 197 F.2d 489 (9th Cir.), *cert. denied*, 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952), has governed proof of much conspiratorial conduct up through the present. *See* Sullivan, *supra*, at 315–19.

Price fixing, however, admits far more easily of circumstantial proof than boycotting. In either case, the plaintiff's duty is to identify acts that prove a conspiracy because they would not have been taken unless one existed. Parallel behavior among competitors is especially probative of price fixing because it is the *sine qua non* of a price fixing conspiracy. If a recalcitrant competitor with sufficient capacity breaks from the conspiratorial fold and sells below the agreed-upon price, customers will flock to him and the arrangement will collapse. Moreover, because price fixing requires rigorous self-discipline by the participants, parallel behavior will often be relatively easy to establish.

In a boycott, however, such strict coordination is barely relevant. The crucial difficulty, at least in this case, lies not at all with proving that suppliers (here, the distributors) acted in concert. That, in fact, need not be proved at all. Rather, Southway's task is to establish the existence of *vertical* inducements—a series of agreements between exhibitors and distributors—not to deal with Southway. Because parallel behavior among suppliers is not necessary to such agreements, it is far less probative of them. Circumstantial proof of a boycott is particularly difficult because the principal tool for showing a conspiracy indirectly, the doctrine of conscious parallelism, is largely insufficient for the task.

Southway is charged with adducing evidence which would not exist unless there were a boycott; if it exists in this case, it will consist of decisions by the distributors that would appear not to have been in the distributors' best interests, or at least irrational, unless they were made in furtherance of a boycott. Southway must show, for instance, that the bids it made were so lucrative that their rejection by the distributors can be explained only as extraordinary exercises of bad judgment or as accommodation to a request by the circuits for preferential treatment. Since consistently bad business judgment is not to be expected from able and experienced corporate decisionmakers, only the conspiratorial inference is plausible. *See Naumkeag Theatre Co. v. New England Theatres, Inc.*, 345 F.2d 910, 914 (1st Cir.), *cert. denied*, 382 U.S. 906, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965).

The difficulty in this kind of proof lies with the absence of unambiguous inferences that may be drawn from each distributor's refusal to license a motion picture. Since the *Paramount* decision, courts have emphasized the multitude of innocent inferences that may just as easily arise from an exhibitor's lack of success in obtaining films. The complexities of the competitive bidding system make outside evaluation of individual bids difficult at best. *See* 334 U.S. at 162–64, 68 S.Ct. at 931–932. In

actions involving claims similar to Southway's, courts have followed *Paramount's* "well nigh impossible" dictum by viewing circumstantial proof of a boycott with the highest degree of skepticism. *See, e.g., Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17 (9th Cir. 1971); *A. L. B. Theatre Corp. v. Loew's, Inc.*, 355 F.2d 495 (7th Cir. 1966); *Naumkeag Theatres Co. v. New England Theatres, Inc.* The plaintiff attempting to prove a boycott circumstantially faces the difficulty that what boycott participants do does not necessarily differ from what they would do in the absence of a boycott. For fear of imagining and punishing a conspiracy that does not exist, the courts have exercised caution by assigning circumstantial evidence less probative value and accordingly demanding more of it.

Also underlying the reluctance of courts to infer illegal conduct from questionable licensing decisions is the doctrine of *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), and its progeny, which have extolled the right of the individual trader to do business with whomever he pleases. That right is threatened if every unilateral refusal to deal forms the basis of a conspiracy charge. In *Paramount Film Distributing Corp. v. Applebaum*, 217 F.2d 101, 124 (5th Cir. 1954), *cert. denied*, 349 U.S. 961, 75 S.Ct. 892, 99 L.Ed. 1284 (1955), the court wrote

> Despite the multitude of decisions against film distributors, it is still the law that ordinarily a distributor has the right to license or refuse to license his film to any exhibitor, pursuant to his own reasoning, so long as he acts independently. The anti-trust laws qualify that right only to the extent that they prohibit contracts, combinations and conspiracies, with another party, which have the purpose or effect of monopolizing or restraining trade in motion picture films. As has been said or implied in so many cases, no exhibitor has an absolute right to demand an exhibition license for the films of any distributor; any illegality consists not in the refusal of any one distributor to license an exhibitor but in his conspiring with one or more other

persons to refuse such license. (footnotes omitted)

These problems of proof are certainly not insurmountable. A clear and consistent pattern of non-dealing in circumstances where dealing would have been more profitable leads correctly to the suggestion that the distributors are impermissibly accommodating the desires of Southway's circuit competitors for exclusive treatment. Because of the leeway afforded to the distributors' decisionmaking processes, however, isolated instances of non-dealing will not suffice to prove a violation. To make out a case for a boycott, Southway must show a systematic and unexplained failure to deal.

We have discussed at length the limits and requirements of the boycott theory because it conforms most closely to the arguments Southway has raised and the evidence it has mustered. To the extent that Southway's allegations survive this challenge on summary judgment, they will have to bear up to similar standards at later points in the litigation. The distributors will be entitled to dismissal of the boycott claims—for instance, in the form of a directed verdict, *see Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877 (9th Cir. 1978); *Cinema-Tex Enterprises, Inc. v. Santikos Theatres, Inc.*, 535 F.2d 932 (5th Cir. 1976);—if Southway subsequently proves unable to make the necessary showing required by our discussion above. To summarize that discussion, Southway can establish a boycott if it proves: (1) a clear and consistent pattern of unexplained refusals to license films by (2) a sufficiently large number of distributors so as to deprive Southway of a substantial supply of licensing opportunities. We turn briefly below to the other antitrust theories available to or invoked by Southway.

### B.  *Other Concerted Refusals to Deal*

We have stated that proof of a boycott requires proof of agreements between at least one exhibitor and a number of distributors, in which each distributor agrees not to license first run films to Southway.

Such an arrangement need not involve any actual concert among the distributors themselves. Southway, however, seeks also to show that the distributors agreed among themselves not to license films to the Jonesboro Twin. That refusal, they argue, arose from a conspiracy which violated the antitrust laws regardless of whether the exhibitor defendants were participants.

A distributor conspiracy may loosely be termed a concerted refusal to deal although, unlike a boycott, no vertical aspect is present. Many of the leading motion picture cases have involved such allegations, sometimes successfully advanced. *See, e.g., United States v. Paramount Pictures; Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964); *Milgram v. Loew's*, 192 F.2d 579 (3rd Cir. 1951) *cert. denied*, 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339 (1952). Absent from the record, however, are both the motive and the proof necessary to sustain the charges in this case.

It would ordinarily seem that a distributor will prefer the largest possible number of operating exhibitors in any given area. More exhibitors are likely to increase the competition for films and accordingly the size of the bids a film will earn. A greater supply of theatres allows more flexibility in charting a pattern of distribution for each film. And any possible disadvantage, such as excessive intrabrand competition,[iii] can be avoided by each distributor when it rejects or accepts bids for individual films.

The distributors' natural interest in a large pool of exhibitors renders suspect any charge that the distributor defendants have, independently of the exhibitors, cut off Southway from a supply of first run films. In the absence of special circumstances, no motive exists for such behavior. In *Paramount*, the motive was plain, because the distributors also owned circuits and wished to eliminate competing theatres. In *Milgram*, the distributors also owned theatres. None had any interest in theatres competing with the plaintiff's Allentown, Pennsylvania, drive-in, but the distributors did own theatres in other cities and the trial court found a conspiracy to relegate drive-ins to second run status nationwide. Nor has Southway alleged that certain distributors have withheld films because Southway does business with a competing distributor they wish to injure.

Moreover, conspiratorial conduct among distributors to achieve some mutually agreed-upon harm to Southway ought to entail some similarity of conduct. While we have not yet examined particular licensing decisions, it is already apparent that the unanimity of conduct by the distributors goes no farther than the failure of all to license a substantial number of first run films to Southway. In all other respects, including their reactions to Southway's requests to bid, their treatment of bids from Southway, and their dealings with other exhibitors, the distributors show few signs of coordinated activity. Thus, neither logic nor evidence appears to support a claim that the distributor defendants, acting other than at the behest of one or more exhibitors, conspired to deprive Southway of first run films.[iv]

---

iii. A distributor may be unlike a typical supplier of goods to retailers, in that the former's return is linked to the profits of its purchaser. Most manufacturers or wholesalers receive a per-unit profit on the goods they sell. Their interest usually lies in lowering retail prices and thereby boosting retail volume at the expense of the retailers's per-unit profit. The film distributor, however, generally receives a percentage of each exhibitor's take. By lessening the number of competing theatres it can grant each a limited territorial monopoly or at least diminish price competition among theatres showing the same film. The distributor can directly benefit from the higher box office gross that this dimunition in competition produces.

iv. Similarly, we find no evidence in the record to sustain a charge of joint market allocation. Southway seeks to apply that characterization to what it believes was a conspiracy among distributors not to treat Clayton County as a separate distribution area, entitled to first run films contemporaneously with Atlanta. We need not determine whether such a decision, if jointly taken, would violate the antitrust laws, since we find no indication of such concerted decisionmaking. Moreover, nothing in the rec-

Southway also charges the defendants with several other anticompetitive schemes outlawed in *Paramount* or other cases. While much of the evidence garnered to support these allegations is relevant to the boycott question, we think that in the present context they will not themselves form the basis for antitrust liability. Southway charges *first* the existence of a split arrangement among the defendants, and *second* the imposition of unreasonable clearances.

Both of these practices can give rise to antitrust liability. A clearance resembles a limited exclusive dealing arrangement. If "unreasonably" extended in time or distance its restrictive effect on competition will be deemed impermissibly burdensome. *See Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 640 (E.D.N.Y.1966), *aff'd,* 388 F.2d 987 (4th Cir. 1967), *cert. denied,* 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968); *Orbo Theatre Corp. v. Loew's, Inc.,* 156 F.Supp. 770, 778 (D.D.C.1957), *aff'd,* 261 F.2d 380 (D.C.Cir.1958), *cert. denied,* 359 U.S. 943, 79 S.Ct. 725, 3 L.Ed.2d 677 (1959).[v] The evidence concerning clearances does not, on its face, contain any suggestion of unreasonableness and it is unclear whether Southway still intends to argue the issue. In fact, Southway's boycott argument suggests as a corollary that it was unnecessary to "clear" the Jonesboro Twin by written contract because of an ongoing understanding that it would never receive first run films its competitors exhibited.

Southway also claims the existence of a split agreement in the Atlanta region. Southway argues that a "playoff" pattern of the major theatres in the Atlanta region links circuit theatres with particular distributors, in that each consistently or predominantly played the films of its allocated distributor.

A split can reduce competition in several ways. First, it may lessen competition in the bidding process, decrease the rentals that distributors can obtain and ultimately lower box office prices. Second, it can reduce price competition among the participating theatres by assuring that one film is not licensed to play in more than one theatre in any locality. Third, if the arrangement includes a promise by distributors to license films only to the split participants, it can eliminate competing exhibitors from the market of films being split and dissuade potential entrants. From Southway's point of view, the third anticompetitive effect is the same as a boycott: other exhibitors have combined to deprive Southway of films. The first two possible effects are irrelevant in this suit because they do not injure Southway. Thus, the split that Southway alleges cannot constitute an independent antitrust violation. The evidence of a split, however, will be relevant to Southway's proof of a boycott.

As we find no evidence of any other antitrust violation, Southway's allegations are properly refined to the single claim of a boycott. Southway's case must henceforth proceed solely under that theory.

---

ord suggests that either (1) requiring Clayton County theatres to bid against Atlanta theatres for first run films or (2) licensing films in Clayton County only after they had played in Atlanta would have been contrary to the best business interests of any individual distributor.

**v.** The courts' relatively lenient attitude toward clearances may be due in part to the likelihood that distributors have both the motive and, through the licensing process, the power to accomplish the same end unilaterally. [Cross

reference omitted.] To this extent, the existence of an agreement with an exhibitor is irrelevant.

A determination of the number of participating distributors needed to transform an exclusive dealing arrangement into a boycott should seek consistency with the rule on unreasonable clearances. Both look ultimately to the degree to which supply is reduced in assessing the legality of an agreement to exclude.